PERRY vs. BOSTON BOARD OF APPEAL, 100 Mass. App. Ct. 138

 
 SAMUEL D. PERRY vs. BOARD OF APPEAL OF BOSTON & another. [Note 1]

100 Mass. App. Ct. 138
 March 11, 2021 - August 18, 2021

Court Below: Superior Court, Suffolk County
Present: Wolohojian, Englander, & Hand, JJ.

 

Zoning, Board of appeals: decision, Conditions, Hearing, Issuance of permit, Special permit. Building Permit. Boston Water and Sewer Commission. Real Property, Flowage of water. Water. Municipal Corporations, By-laws and ordinances.

In a civil action brought by the plaintiff abutter challenging the approval by the Board of Appeal of Boston (board) of the defendant landowner's proposal for a mixed residential and commercial development located in a groundwater conservation overlay district, a Superior Court judge did not err in affirming the board's issuance of a conditional use permit, where there was evidence to support a finding that the site's stormwater infiltration system would capture more than the minimum volume of rainfall required under the local zoning ordinance, and there was no merit to the plaintiff's contention that such a system must capture all the rainfall that falls on the site; where the findings of the judge supported the conclusion that the defendant's proposed project would not have a negative impact on groundwater levels within the lot or in adjacent lots; and where, despite not having the opportunity to be heard at the board hearing, the plaintiff had the opportunity in the Superior Court to present evidence and raise any issues he would have raised to the board. [143-149]

CIVIL ACTION commenced in the Superior Court Department on December 22, 2014.

 The case was heard by Robert L. Ullmann, J.

 Jeremy Y. Weltman for the plaintiff.

 Julie Pruitt Barry for the defendants.

 Peter S. Brooks, for Boston Groundwater Trust & others, amici curiae, submitted a brief.

 ENGLANDER, J. The plaintiff Samuel D. Perry appeals from a judgment of the Superior Court, which affirmed a decision of the city of Boston's board of appeal (board) granting a conditional use permit for a mixed residential and commercial development 

 Page 139 

at the corner of Hereford and Newbury Streets, in the Back Bay section of Boston. Cleared of the underbrush, the principal issue before the board involved whether the defendant Patrick J. Glynn's development complied with the groundwater requirements of Article 32 of the city's zoning code (code), applicable within the city's groundwater conservation overlay district. Preservation of groundwater levels is particularly important in the Back Bay, because the buildings rest on wooden pilings, which must be immersed in groundwater to prevent them from rotting. The construction on and paving of properties diminishes the amount of pervious area available for rainwater to infiltrate the ground, so alternative engineering is needed to ensure that groundwater is recharged. See Article 32, §§ 32-3, 32-6. See also Reynolds v. Zoning Bd. of Appeals of Stow, 88 Mass. App. Ct. 339, 342-343 (2015). In granting the conditional use permit, the board concluded that Glynn's project design for handling rainwater at the site (a so-called stormwater infiltration system) was appropriate to satisfy the requirements of Article 32, § 32-6(a), and would satisfy the requirement of Article 32, § 32-6(b), that the project not negatively impact the groundwater levels at the site or on adjacent lots.

 After a jury-waived trial, a Superior Court judge affirmed the board's conclusions. In his decision, the judge construed Article 32, § 32-6, of the code (§ 32-6) and he reasoned, among other things, that a stormwater infiltration system that meets the design requirements of § 32-6(a), is presumed also to meet the "no negative impact on groundwater" requirement of § 32-6(b). Perry appeals, arguing in particular that the judge's reasoning relieved Glynn from the obligation to show that the project would not negatively impact groundwater levels on the site or at Perry's property. We affirm the judgment, although for reasons somewhat different from those of the Superior Court judge. [Note 2]

 Background. The facts are derived from the judge's findings after trial; some facts were agreed to by the parties, and the judge made additional findings on the disputed facts.

 1. The relevant properties and the "Proposed Project." [Note 3] The locus at issue encompasses five addresses -- 45, 47, 49, 51, and 

 Page 140 

53 Hereford Street. In April of 2014, Glynn applied for a building permit to restore and to refurbish existing residential units at 45, 47, and 49 Hereford Street, and to construct a retail and office building addition to existing structures at 51 and 53 Hereford Street (Proposed Project). Plaintiff Perry owns 323-327 Newbury Street, which directly abuts the Proposed Project. The properties are located in the groundwater conservation overlay district (GCOD).

 2. Groundwater conservation overlay district. GCODs are established by Article 32 of the code, and certain projects located within a GCOD (such as the Proposed Project) are subject to the provisions of Article 32. As indicated, maintaining appropriate groundwater levels in the Back Bay is imperative, because if groundwater levels lower and expose the wood pilings to air, the pilings could rot and the buildings could settle. Thus, the stated purposes of the GCOD are to "(a) prevent the deterioration of and, where necessary, promote the restoration of, groundwater levels in the city of Boston; (b) protect and enhance the city's historic neighborhoods and structures, and otherwise conserve the value of its land and buildings; (c) reduce surface water runoff and water pollution; and (d) maintain public safety." Article 32, § 32-1.

 A proposed project located within a GCOD must obtain a conditional use permit (CUP) -- the equivalent of a special permit under G. L. c. 40A. [Note 4] See Article 32, § 32-3(3). See also KCI Mgt., Inc. v. Board of Appeal of Boston, 54 Mass. App. Ct. 254, 260 n.8 (2002). In addition to compliance with the general provisions regulating CUPs in Article 6 of the code, projects in a GCOD that propose to construct a new structure, extend an existing structure, or substantially rehabilitate a structure must also comply with Article 32. See Article 32, §§ 32-4, 32-6. Section 32-6 provides in pertinent part:

"To obtain a conditional use permit from the Board of Appeal, the Applicant shall show that the Proposed Project complies with the following requirements, in addition to the 

 Page 141 

standards set forth in Article 6:

"(a) provision that any Proposed Project promote infiltration of rainwater into the ground by capturing within a suitably-designed system a volume of rainfall on the lot equivalent to no less than 1.0 inches across that portion of the surface area of the lot to be occupied by the Proposed Project . . . (emphasis added); and

"(b) provision that any Proposed Project result in no negative impact on groundwater levels within the lot in question or adjacent lots . . . (emphasis added).

"The Applicant shall demonstrate that the Proposed Project meets the requirements of this section by certification from a Massachusetts registered engineer or other expert or authoritative body recognized by the Board of Appeal."

 3. The proposed stormwater infiltration system. In connection with his application for a CUP, Glynn submitted plans for a stormwater infiltration system designed by a professional engineer to comply with § 32-6(a). At the time this system was designed and submitted, the existing condition of the locus was that very little of it was pervious; a portion of the lot was paved, and the remainder was occupied by structures. No part of the locus had a stormwater infiltration system. Rather, the judge found that any stormwater runoff was directed into the combined sewer in public alley 430, meaning that the water was disposed of off-site. [Note 5]

 The proposed stormwater infiltration system was designed to change the existing condition by retaining rainwater on site, and then infiltrating the rainwater back into the ground. The Proposed Project's site grading and utility plan, including the stormwater infiltration system, was approved by the Boston water and sewer commission (BWSC), with a notation that the system complied with the GCOD requirements.

 4. The board's decision. The board conducted a hearing, issued 

 Page 142 

findings, and approved the CUP. [Note 6] The board found that the proposed stormwater system "will collect, store, and recharge one-inch of stormwater runoff from all new impervious areas." Further, the board explicitly found that the Proposed Project would have no negative impact on groundwater at the lot in question or at adjacent lots. The board noted that in addition to BWSC's approval, an engineer's certificate confirmed that the system satisfied the GCOD requirements and additionally would have specific beneficial groundwater impacts. Those beneficial impacts included that the proposed stormwater infiltration system would be a substantial improvement over the existing conditions on the site, as under the existing conditions stormwater was directed into the stormwater sewer system and was not infiltrated to recharge the groundwater. The board accordingly concluded that the project complied with § 32-6(a) and 6(b).

 5. The Superior Court decision. Perry appealed to the Superior Court, which conducted a de novo hearing as provided by applicable law. See Crittenton Hastings House of the Florence Crittenton League v. Board of Appeal of Boston, 25 Mass. App. Ct. 704, 713 (1988). A Superior Court judge affirmed the board's decision to grant a CUP. As to Article 32, the judge concluded that the board had a "strong basis" to decide that the proposed stormwater infiltration system (which had been revised after the board's 2014 approval) met the volume capture and capacity requirements of § 32-6(a). [Note 7] Moving on to the "no negative impact on groundwater" requirement of § 32-6(b), the judge was of the view that the board had not done a "separate assessment" of this subsection, but that such a separate assessment was unnecessary, because where an applicant has satisfied the requirements of subsection (a), "the applicant is presumed to have satisfied the no harm to groundwater levels condition of Article § 32-6(b), a presumption that factually may be irrebuttable." This appeal 

 Page 143 

followed. [Note 8]

 Discussion. Perry's arguments on appeal are principally directed at the judge's conclusion that Glynn's plans complied with Article 32. Specifically, Perry argues that (i) some downspouts from the front of the roofs of the buildings are not connected to the infiltration system and, therefore, the system will not capture the amount of rainwater required by § 32-6(a); and (ii) the judge was wrong to presume that compliance with § 32-6(a) means that the proposed system will comply with the requirements of § 32-6(b).

 1. Standard of review. In cases brought under Boston's zoning act, "we are guided by cases decided under the analogous provisions of G. L. c. 40A, § 17." 311 West Broadway LLC v. Board of Appeal of Boston, 90 Mass. App. Ct. 68, 73 (2016). [Note 9] "The standard of review for a special permit . . . requires the judge to make independent findings on the evidence presented to the judge, and to determine, based on that evidence, the legal validity of the decision of the permit granting authority." Barlow v. Planning Bd. of Wayland, 64 Mass. App. Ct. 314, 321 (2005). "If the board's decision is supported by the facts found by the judge, it 'may be disturbed only if it is based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary.'" Fish v. Accidental Auto Body, Inc., 95 Mass. App. Ct. 355, 362 (2019), quoting Bateman v. Board of Appeals of Georgetown, 56 Mass. App. Ct. 236, 242 (2002). Glynn, as the applicant, had the burden to demonstrate that the prerequisites were met and that zoning relief was justified. See Martin v. Board of Appeals of Yarmouth, 20 Mass. App. Ct. 972, 972 (1985).

 2. Unconnected downspouts. The plain language of § 32-6(a) requires a stormwater infiltration system that will capture a certain minimum "volume" of rainfall and introduce it to the ground. Even Perry concedes that the design of Glynn's system is sufficient to meet the "capacity" requirements of § 32-6(a) -- that is, the system dimensions are such that it can store the required volume and introduce

 Page 144 

 it to the ground. Perry argues, however, that where the front drains of 45-49 Hereford Street will not be connected to the infiltration system, the system will not actually "capture" rainfall from the entire surface occupied by the Proposed Project. Perry claims that the failure to incorporate these front drains means that the system does not meet the requirements of § 32-6(a).

 Perry does not cite any authority for his contention that a system must capture all the rainfall that falls on a site, and indeed, that is not what § 32-6(a) says. Rather, § 32-6(a) merely defines a volume that the system must be capable of capturing and storing, and it uses the surface area of the Proposed Project to define and to calculate that volume. [Note 10] The formula is not precise -- it does not specify, for example, a percentage of rainfall falling on the site that must be captured over a particular time period. Nor does it state that the system must be capable of capturing rainfall from all areas of the site. Instead, the requirement is to capture the "equivalent" of one inch of rainwater across the surface area of the Proposed Project, which allows some flexibility as to how much of the surface area must drain into the system. Accordingly, the fact that a portion of the roofs of some of the buildings does not drain into the stormwater infiltration system, does not mean that the system cannot capture the requisite amount of rainwater. If the code were intended to require all the rainfall across the surface area of the lot to be captured, the code would have so provided.

 Here, the judge credited evidence that the system was designed to be approximately twenty percent over capacity -- that is, it was designed to collect and to store more rainwater than was required. Both the board and the judge credited the opinion of Boston water and sewer commission's site plan review engineer that the system would meet the requirements of Article 32. The judge also relied on the opinion of a second engineer, Joel Breuer, who testified to the same effect. That the front drains of some of the roofs on site do not drain into the system does not demonstrate that the board and the judge improperly relied on the engineers' opinions.

 3. Section 32-6(b). The judge concluded that there is a virtually irrebuttable presumption that if a system is designed to comply

 Page 145 

 with § 32-6(a), then § 32-6(b) is also satisfied. We agree with Perry that this aspect of the judge's reasoning was incorrect. We nevertheless affirm the judgment, because the findings of the judge (consistent with the findings of the board) support the conclusion that the Proposed Project will not have a negative impact on groundwater levels within the lot or adjacent lots. See Colony of Wellfleet, Inc. v. Harris, 71 Mass. App. Ct. 522, 529 (2008) (court will affirm "as long as the result is correct on any ground apparent on the record").

 The question of how to interpret § 32-6(b), and its relationship to § 32-6(a), presents a question of law, akin to interpreting a statute or regulation. A well-known principle of interpretation is that "[w]e 'endeavor to interpret a statute to give effect "to all its provisions, so that no part will be inoperative or superfluous."'" Shirley Wayside Ltd. Partnership v. Board of Appeals of Shirley, 461 Mass. 469, 477 (2012), quoting Connors v. Annino, 460 Mass. 790, 796 (2011). The judge's presumption that compliance with § 32-6(a) will ensure compliance with § 32-6(b) runs afoul of the above principle of construction, by suggesting that § 32-6(b) has no independent meaning. Not only is that construction at odds with the conjunctive "and" that separates the two subsections, but a plain reading reveals that the two subsections set out different requirements. As indicated, § 32-6(a) requires the project to include certain engineering -- a stormwater infiltration system that will capture and recharge a certain volume of rainwater. Section 32-6(b), on the other hand, establishes a comparative test: the Proposed Project must result in no "negative impact" on groundwater levels within the lot in question or adjacent lots, meaning that the Proposed Project will not result in reduced groundwater levels, when compared to existing conditions. [Note 11] While the two tests are related (one has to know the design of the infiltration system in order to evaluate whether the project will positively or negatively impact groundwater), it does not necessarily follow that compliance with § 32-6(a) will result in compliance

 Page 146 

 with § 32-6(b) -- for example, if the proposed infiltration system will capture and infiltrate materially less rainwater than the existing conditions at the site.

 The judgment need not be vacated under the circumstances, however, because both the board and the judge made findings that the Proposed Project in fact will not result in a negative impact on groundwater levels. The board described the existing condition as follows: "The area . . . is currently paved, used for parking, and stormwater drains to two existing catch basins depriving the area of stormwater infiltration/groundwater recharge." In contrast, "the [P]roposed [P]roject includes a stormwater infiltration system which will collect 'clean' roof runoff" as well as rainwater from "on-site area drains for walkways." Put differently, in the preproject condition all or nearly all the rainwater on the site discharged into the stormwater sewer system, and none of it was infiltrated into the ground. In contrast, postconstruction, the site was designed to and could collect and infiltrate at a minimum, an amount equivalent to one inch over the surface area of the Proposed Project. The board found that the result would be "beneficial impacts" on groundwater levels in the area, because "there will be a substantial reduction in stormwater runoff from the site."

 In short, the board did not merely "presume" that compliance with § 32-6(a) yielded "no negative impact on groundwater levels"; it also analyzed the pre- and postproject conditions in this case and concluded that the impact would be beneficial. And after trial, the judge made essentially the same factual findings: that is, in the existing condition, the properties "just connected directly to the combined sewer," whereas the Proposed Project included a stormwater infiltration system that met the requirements of Article 32. Indeed, the judge expressly found, based upon the expert testimony, that "the Proposed Project will not have any negative impact on groundwater levels on the Perry Property."

 The judge's findings after trial confirm that the board's conclusions were supported by substantial evidence. On appeal, Perry does not challenge the above findings of the judge as clearly erroneous, but rather criticizes the judge's employment of the presumption discussed above. That error by the judge is not critical, however, where the evidence supported the board's conclusion, and the judge's conclusion after a de novo hearing, that there would be no negative impacts.

 Perry also contends, however, that because the evidence focused on the rainwater systems on Glynn's lot, the evidence was

 Page 147 

 in any event insufficient to show that there would be no negative impact to groundwater on Perry's lot. We disagree. The expert testimony addressed why Glynn's proposed system would improve groundwater conditions, and also addressed how groundwater systems operated generally. There was no evidence that suggested that by infiltrating more water into the ground at Glynn's property, levels at Perry's property could somehow be negatively impacted.

 Indeed, the judge credited testimony that groundwater "moves sideways. It flows." The expert testimony supported the conclusion that in the absence of other intervening factors, which have not been alleged here, a system that adds water to the groundwater at one site would be expected to improve conditions at adjacent sites. [Note 12] To the extent Perry argues that testing of the adjacent property is the only way to determine whether the Proposed Project might have a detrimental impact on the groundwater at the Perry property, we reject that proposition. While we do not rule out that in other, less obvious circumstances, additional groundwater assessment at adjacent properties might be warranted, here additional evaluation was not necessary where the proposed stormwater infiltration system by all accounts significantly improved the groundwater recharge on the site.

 Perry also challenges the board's conclusion on the ground that it failed to account for Glynn's actions, in 2006 and before, when he apparently illegally paved over portions of the site that had previously had grass and trees. Perry seems to be suggesting that under § 32-6(b), the "impact" of the Proposed Project should be measured against those earlier site conditions.

 Again, we disagree. Section 32-6(b) specifically requires an evaluation of the "impact" from the "Proposed Project." The comparison accordingly is between the existing conditions

 Page 148 

 immediately preproject, and the conditions postproject. Perry's suggestion to pick an existing condition from years earlier is inconsistent with the language of the code, and would result in an evaluation, not of the impact of the project, but of some other change to the property that took place years earlier. There are other potential remedies that may have been available to Perry with respect to Glynn's 2006 actions; but the remedy is not to jerry-rig the comparison required by § 32-6(b).

 Perry also argues that the judge should not have considered evidence of the 2017 modified system design, because those modifications were made after the board's hearing in 2014. It is well settled, however, that the judge may consider evidence that was not introduced to the board. See Bicknell Realty Co. v. Board of Appeal of Boston, 330 Mass. 676, 679 (1953). Moreover, Perry of course had the opportunity to address the modified design at trial. The judge found that the 2017 system is roughly the same size and on the same footprint, and that the modifications made it easier to clean and maintain the system, substituted crushed stone for perforated pipe, and made "other changes that did not adversely affect the system's design or operation." It is anticipatable that as a proposed design progresses through various reviews, there will be adjustments. There was no showing that the modifications were so substantial that they required a new hearing before the board. Compare Barlow, 64 Mass. App. Ct. at 319 (plan that differed markedly from original special permit plan required modification hearing with notice to abutters).

 Finally, Perry argues that he was denied due process because the board refused to allow his attorney to make a presentation at the hearing. To be sure, the board erred in failing to allow Perry's attorney to present any evidence he might have had regarding the impacts on groundwater at Perry's property. The purpose of the hearing, among other things, was to evaluate that precise issue, and as an abutter Perry should have been afforded a reasonable opportunity to be heard. However, even where there has been an absence of notice of a hearing -- thus rendering an abutter unable to participate -- we have held that the plaintiff must show prejudice. See Chiuccariello v. Building Comm'r of Boston, 29 Mass. App. Ct. 482, 487 (1990) (failure to provide abutter notice did not deprive board of jurisdiction; abutter could seek relief in nature of mandamus). Here, the judge found no prejudice because Perry had the opportunity in the Superior Court to present any evidence and to raise any issue that he

 Page 149 

 would have raised to the board. The judge concluded, "Perry had the opportunity at the de novo hearing before this [c]ourt to prove that the Proposed Project would have a negative impact on groundwater levels on the Perry Property, and he did not prove it."

 For all the foregoing reasons, we affirm the judgment of the Superior Court. [Note 13]

So ordered.

FOOTNOTES
[Note 1] Patrick J. Glynn. 

[Note 2] We acknowledge the amicus brief submitted by the Boston Groundwater Trust, Beacon Hill Civic Association, Inc., and Neighborhood Association of the Back Bay, Inc. 

[Note 3] We refer to the "Proposed Project" to be consistent with the judge's decision and Article 32. 

[Note 4] "In contrast with a use allowed as of right, 'a [conditional use permit] concerns a use thought under the zoning code to be potentially acceptable in a zoning district, but only after and subject to review and permission of a permit granting authority, to the end that the use applied for be compatible with the allowed uses in the area in which it is to be planted.'" KCI Mgt., Inc. v. Board of Appeal of Boston, 54 Mass. App. Ct. 254, 260 (2002), quoting Duteau v. Zoning Bd. of Appeals of Webster, 47 Mass. App. Ct. 664, 667 (1999). 

[Note 5] We discuss infra Perry's contention that Glynn had paved over portions of the site years before, in 2006, and that the pre-2006 condition needed to be considered in evaluating any groundwater impacts from the Proposed Project. We note that the judge found that in September of 2010, Boston's inspectional services department cited Glynn for paving over the Hereford Street properties without a permit. 

[Note 6] Perry's counsel was not allowed to make a presentation at the board hearing. We discuss infra Perry's contention that this denial constituted reversible error, in light of the fact that Perry had a full opportunity to present evidence at the subsequent Superior Court trial. 

[Note 7] The stormwater infiltration system that Glynn presented at the 2019 trial had been redesigned since the 2014 board presentation. The judge found, among other things, that the redesigned system was "similar in numerous respects to the 2014 design, and it is roughly the same size on the same footprint." 

[Note 8] In addition, the judge rejected Perry's arguments that (i) his due process rights were violated at the board's hearing because his attorney was not allowed to speak; (ii) the judge should not consider the amendments made to the stormwater infiltration system after the board's approval; and (iii) to comply with § 32-6, all the stormwater falling on the site must be captured and infiltrated. 

[Note 9] As an abutter, Perry enjoys a presumption of standing, see Bedford v. Trustees of Boston Univ., 25 Mass. App. Ct. 372, 376 (1988), which Glynn has not contested either in the Superior Court or in this appeal. 

[Note 10] The parties and the judge read § 32-6(a) to establish both a "capture" and a "capacity" requirement, meaning that the system must be capable of collecting a certain volume of rainwater, and also of storing that volume so that it can be introduced to the ground and does not overflow. We agree that the word "capturing" in § 32-6(a) encompasses both concepts. 

[Note 11] Notably, § 32-6 already sets forth an express but narrow circumstance when compliance may be presumed. When a project proposes a one-, two-, or three-family residence, and the rainfall infiltration system complies with "pertinent specifications approved by the Commissioner of Inspectional Services," then there is a presumption of compliance with § 32-6(a). The express inclusion of this presumption suggests that other presumptions of compliance were not intended. "[I]nclusio unius est exclusio alterius." Miles-Matthias v. Zoning Bd. of Appeals of Seekonk, 84 Mass. App. Ct. 778, 789 (2014), citing Harborview Residents' Comm., Inc. v. Quincy Hous. Auth., 368 Mass. 425, 432 (1975). 

[Note 12] While the judge was wrong to employ a presumption, his reasoning appears to have been influenced by expert testimony, which he credited, to the effect that "[n]o one building . . . can raise or lower the groundwater level all by itself," which led the judge to conclude that "an individual assessment of the effect of each new project on groundwater levels on adjacent lots would be largely or entirely an exercise in futility." 

 We are not persuaded that the § 32-6(b) question is essentially unanswerable. While it may be very difficult to quantitatively assess the impact on groundwater levels from a single project, qualitative assessment may well be possible. Such an issue is a proper subject of expert analysis, expert testimony, and resolution by a finder of fact. This case is an example, where the experts stated that groundwater levels would be benefited by the new system.

[Note 13] The defendants' request for appellate attorney's fees and costs is denied. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.