NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-463

GEORGE BUTLER & another[1]

vs.

ZONING BOARD OF APPEALS OF MATTAPOISETT & others.[2]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiffs, Maureen and George Butler, are neighbors in Mattapoisett (town) of the Inn on Shipyard Park, which is owned by defendant Vintage 13, LLC, and operated by defendant Nils Johnson (collectively, defendants). After complaining for years about noise made by live music performances at the Inn, the plaintiffs petitioned the town zoning board of appeals (board) to enforce its zoning bylaws, arguing that the defendants had changed the Inn to a nightclub, which no longer complied as a preexisting nonconforming use. The board denied the petition. The plaintiffs sought review of the denial in the Superior Court, and also alleged that the noise constituted a nuisance.

---

[1] Maureen Butler.

[2] Nils Johnson and Vintage 13, LLC. The zoning board appeared at trial but has not filed a brief on appeal.

After a jury-waived trial, a judge concluded that the defendants' operation of the Inn did not constitute either a change to the preexisting nonconforming use or a nuisance. The plaintiffs now appeal, and we affirm.

Background. We draw the facts from those found by the judge after the jury-waived trial, supplemented by the documentary evidence.

The Inn is located at 13 Water Street and faces Mattapoisett Harbor. Built as a tavern in 1799, it is one of the oldest operating inns on the eastern seaboard. Throughout most of its history, the Inn has offered lodging, food, drink, and musical entertainment to the public.[3]

In 1967, the town enacted zoning bylaws for the first time. Section 5.5 of the zoning bylaws designated as residential the district where the Inn is located. Sections 3.1.1 & 3.1.2.1 provided that preexisting nonconforming uses may be continued, except that a special permit would be required for "any change of a nonconforming use or substantial extension of a nonconforming use." When the zoning bylaws were enacted, the Inn was owned by Irving Bookstein and offered public lodging, food, drink, and musical entertainment with instruments that were not electronically amplified.

---

[3] At various points in its history, the Inn was called by other names. For the sake of simplicity, we refer to it as the Inn.

Between 1978 and 2004, the Inn was owned by Mark Goddu. During those years, musical entertainment increased. It was offered three to five nights per week, until 1 A.M. On weekends, the Inn was "raucous and loud," lines of patrons waited outside to enter, and the music, which was electronically amplified, could be heard outside.

Meanwhile, the plaintiffs had patronized the Inn since the 1960s. In 1995, the plaintiffs purchased 11 Water Street, which is adjacent to the Inn's property. In 2000, plaintiff Maureen Butler purchased 9 Water Street, which is to the rear of 11 Water Street. Both 9 and 11 Water Street are separated from the Inn building by a driveway that is about ten feet wide and leads to a parking lot behind the Inn. In 2005, the plaintiffs moved to 9 Water Street and began renting 11 Water Street to tenants. While Goddu owned the Inn, the plaintiffs did not complain about the music and noise.

In 2004, the Inn was sold to Anthony Clark and Michael Galway, who operated an Irish pub on the premises until 2012. It continued to feature electronically amplified music. At first, the genre was Irish music, but eventually it transitioned to feature more rock and roll. In response to noise complaints from the plaintiffs, Clark and Galway installed sound-proofing insulation on the wall closest to the plaintiffs' properties and replaced windows on that side with small, porthole-style

3

windows.  Clark also obtained a decibel meter and kept a log of the readings; he tried to keep the volume of music at about sixty-five decibels.

Beginning in 2012, defendant Johnson leased the Inn, and then purchased defendant Vintage 13, LLC, which owned the Inn. The Inn continued to offer lodging, food, drink, and live, electronically amplified music, but the music was quieter than it had been during Goddu's ownership.  The genres of music now included rock and roll, blues, rhythm and blues, and jazz at Sunday brunch.  The Inn's patrons, many of whom were in their fifties or older, had decreased in number since during Goddu's ownership, so that lines of patrons no longer waited outside the Inn to enter.  Even so, the plaintiffs complained frequently about noise and music coming from the Inn:  they made over three hundred complaints to police and sent more than twenty letters of complaint to town officials.  Few people other than the plaintiffs have complained about the Inn.

The plaintiffs requested that the town's zoning enforcement officer enforce the zoning bylaws, arguing that the defendants' use of the Inn had changed to a nightclub.  The plaintiffs requested that the defendants be ordered, among other things, to "eliminate noise from the [Inn] which is audible to [the plaintiffs] at their residence."  After the zoning enforcement officer failed to act on that request, the plaintiffs appealed

4

to the board.  See G. L. c. 40A, §§ 8 & 15.  The board held a public hearing at which it considered information including statements of residents in attendance, and then issued a decision concluding that the defendants had not changed or substantially extended the Inn's use, as compared to its use in 1967 when the town first adopted zoning bylaws.[4]

In 2016, the plaintiffs filed the Superior Court complaint alleging, as relevant here, two counts.[5]  One count sought review pursuant to G. L. c. 40A, § 17, of the board's decision, alleging that the defendants had changed the use of the Inn and substantially intensified its nonconformity, as defined in § 3.1.2.1 of the zoning bylaws.  The other count alleged that the defendants created a common-law nuisance by permitting noise

---

[4] The plaintiffs also requested the zoning enforcement officer to order the defendants to stop the use of the Inn for entertaining customers who were not also lodgers or restaurant patrons.  The board found that there was "no evidence whatsoever" to support the plaintiffs' claim that in 1967 the Inn provided entertainment only to lodgers.  The plaintiffs did not raise that issue in their Superior Court complaint or on appeal, and so we do not consider it.

[5] In a third count, the complaint alleged that the noise coming from the Inn was "obnoxious" in violation of § 2.8 of the zoning bylaws.  The plaintiffs had unsuccessfully made that claim to the town's zoning enforcement officer and the board.  On review pursuant to G. L. c. 40A, § 17, the judge denied the plaintiffs relief, interpreting the zoning bylaws to mean that § 2.8 did not apply in the residential district where the Inn and the plaintiffs' properties are located.  The plaintiffs do not raise the claim on appeal, and so we do not reach it.

5

pollution prohibited by 310 Code Mass. Regs. § 7.10(1) (2001), promulgated by the Department of Environmental Protection (DEP).

In 2017, the plaintiffs' acoustical engineer conducted a noise survey, which determined that

> "the primary area of noise transmission from inside [t]he Inn to the outside was the exit door to the handicap ramp from the bar area, which exited into the alley directly adjacent to the [plaintiffs'] property. Not only was noise emanating through the door, but, whenever the door was opened, which occurred frequently while music was being played, noise levels at the property line increased significantly."

In May 2018, the defendants added an enclosed, sound-proofed vestibule to the Inn's rear door, at a cost of $16,000. The vestibule substantially mitigated the volume of noise heard outside the Inn, but did not eliminate it, particularly when the door was opened.[6]

In May 2021, the judge conducted a ten-day, jury-waived trial during which he heard testimony of more than twenty witnesses, reviewed dozens of exhibits, and took a view of the Inn.[7] The exhibits included audio-visual recordings taken from

---

[6] In March 2020, because of the COVID-19 pandemic, the Inn substantially curbed its operations. Between then and the time of trial, the Inn did not offer musical entertainment.

[7] This complaint was tried with another complaint in which the plaintiffs sought G. L. c. 40A, § 17, relief from the board's issuance of a special permit for the defendants to renovate the Inn's front porch. The judge affirmed the issuance of the special permit. The plaintiffs do not appeal from that judgment, and so we do not consider any issues pertaining to the issuance of the special permit.

6

the plaintiffs' property that depicted the Inn's rear door, both before and after construction of the vestibule, and reproduced the sound coming from the Inn. They also included graphs depicting decibel readings taken at the plaintiffs' properties, both before and after construction of the vestibule. The judge concluded that the defendants had not changed or substantially extended the nonconforming use, and that the sound coming from the Inn did not constitute a nuisance.

Discussion. 1. Change or substantial extension to preexisting nonconforming use. Both the board and the judge concluded that the defendants' use of the Inn did not constitute a change or a substantial extension to the nonconforming use of the property that existed in 1967, and therefore the defendants were exempted by G. L. c. 40A, § 6, and § 3.1 of the zoning bylaws from compliance with the zoning bylaws. The plaintiffs argue that the judge's conclusion was clearly erroneous.

Like the judge, we give "substantial deference" to the board's interpretation of the zoning bylaws. See Wendy's Old Fashioned Hamburgers of N.Y., Inc. v. Board of Appeal of Billerica, 454 Mass. 374, 381 (2009). As to the facts found by the judge after trial, we accept them unless clearly erroneous, but review de novo his legal conclusions, including interpretations of the zoning bylaws. See Shirley Wayside Ltd. Partnership v. Board of Appeals of Shirley, 461 Mass. 469, 475

7

(2012).  Where, as here, "the board's decision is supported by the facts found by the judge, it 'may be disturbed only if it is based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary.'"  Perry v. Board of Appeal of Boston, 100 Mass. App. Ct. 138, 143 (2021), quoting Fish v. Accidental Auto Body, Inc., 95 Mass. App. Ct. 355, 362 (2019).

Like the board, the judge applied the three-part test enunciated in Bridgewater v. Chuckran, 351 Mass. 20, 23 (1966), in analyzing whether the defendants' use of the Inn had changed from how it was used in 1967.  Under that test, we consider: "(1) Whether the use reflects the 'nature and purpose' of the use prevailing when the zoning by-law took effect" in 1967; "(2) Whether there is a difference in the quality or character, as well as the degree, of use"; and "(3) Whether the current use is 'different in kind in its effect on the neighborhood'" (citation omitted).  Id.  See also Cape Resort Hotels, Inc. v. Alcoholic Licensing Bd. of Falmouth, 385 Mass. 205, 212 (1982). The burden is on the defendants, as property owners, to prove "the requisite similarity" between the present use and the original nonconforming use.  Almeida v. Arruda, 89 Mass. App. Ct. 241, 244 (2016).

As to the first prong of the Bridgewater test, the judge concluded that the defendants' use of the Inn reflected the same nature and purpose as the use in 1967.  In 1967, the Inn offered

8

lodging, food, drink, and musical entertainment to the public. Except for the pause in its operations due to the COVID-19 pandemic, at the time of trial the defendants used the Inn for the same purposes. We agree that the judge properly found that the defendants met the first prong. See Almeida, 89 Mass. App. Ct. at 245 (first prong met where addition of beer and wine sales did not change nature or purpose of convenience store). Contrast Cape Resort Hotels, Inc., 385 Mass. at 212-213 (use as full-service resort hotel changed to "largest entertainment complex on Cape Cod").

As to the second prong of the Bridgewater test, like the board, the judge concluded that there was "no difference in the quality or character or in the degree of use" of the Inn at the time of trial as compared to in 1967. The judge found that, as in 1967, at the time of trial the Inn was "still primarily a restaurant and bar with musical entertainment." Therefore, the second prong of the test was satisfied. See Almeida, 89 Mass. App. Ct. at 246 (second prong satisfied where judge found that beer and wine sales "would not predominate," but "operate as an adjunct" to grocery sales). Contrast Cape Resort Hotels, Inc., 385 Mass. at 213 ("lodging and meals have been supplanted as the dominant business of the hotel by fully developed entertainment facilities designed especially to attract crowds of young people").

9

Under the third prong of the Bridgewater test, the judge concluded that the defendants' use of the Inn was not different in kind in its effect on the neighborhood than the Inn's use in 1967, because "[t]he evidence presented does not support the conclusion that the music today is significantly louder, or more of a disturbance to neighbors, than in the Bookstein era." In doing so, the judge rejected the plaintiffs' claim that the use differed in kind in its effect on the neighborhood because the defendants presented music with electronically amplified equipment, but in 1967 Bookstein presented singing accompanied by piano.[8] The judge concluded that the change in electronic amplification did not result in a substantially different effect on the neighborhood, because of other factors that reduced any disturbance. Those included the vestibule that the defendants built around the Inn's rear door in May 2018, the soundproofing and smaller porthole windows installed on the side of the Inn closest to the plaintiffs, and the music's ending by 12:15 A.M. instead of 1 A.M. as it had during Bookstein's ownership. See

---

[8] The judge's factual findings differed from those of the board in one respect. The board found that "[l]oud, amplified musical entertainment existed at the [Inn] in 1967." In contrast, the judge found that in 1967, the Inn "offered singing, and sing-alongs, with piano and acoustical instruments," but not electric guitars or drums. We accept the judge's finding of fact, see Shirley Wayside Ltd. Partnership, 461 Mass. at 475, and assume for the purposes of our analysis that only acoustic, and not electronically amplified, musical instruments were played at the Inn in 1967.

Almeida, 89 Mass. App. Ct. at 246-247 (third prong satisfied where judge found that beer and wine sales would not affect neighborhood traffic, litter, or safety in way different in kind from current store).  Contrast Cape Resort Hotels, Inc., 385 Mass. at 216 (entertainment complex generated "traffic and noise problems wholly different" from prior use).

The plaintiffs fault the judge's application of the Bridgewater test, 351 Mass. at 23, contending that he did not conduct sufficient analysis under the test's second prong and conflated it with the first prong.  We are not persuaded.  In discussing whether under the third prong the defendants' use of the Inn was "different in kind" in its effect on the neighborhood, Bridgewater, supra, quoting Medford v. Marinucci Bros. & Co., 344 Mass. 50, 60 (1962), the judge analyzed facts that also pertained to whether under the second prong the defendants' use was "differen[t] in the quality or character, as well as the degree, of use," Bridgewater, supra, quoting Brady v. Board of Appeals of Westport, 348 Mass. 515, 523 (1965).  Where the second and third prongs of the test are so similarly worded as "different in kind" and "differen[t] in . . . quality or character," we will not fault the judge for including fewer facts in his analysis under the second prong.  He did not have to reiterate the same facts at every step of his analysis.

11

2.  Nuisance.  The plaintiffs argue that, in concluding that they had not proven that the sound coming from the Inn constituted a nuisance, the judge erred in several respects. They contend that the judge made factual errors as to the decibel levels of sound emitted from the Inn, and legal errors in declining to apply the DEP noise pollution regulation and in misapplying the doctrine of "coming to the nuisance," and that those errors infected his conclusion as to nuisance.  Because the judge was the trier of fact, we accept his findings unless shown to be clearly erroneous, and we give due regard to his opportunity to judge the credibility of witnesses, including the plaintiffs' expert.  Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996).  We consider de novo the judge's rulings of law.

The plaintiffs bore a "heavy burden" to prove their nuisance claim.  Rattigan v. Wile, 445 Mass. 850, 855 (2006).  A nuisance is "a substantial and unreasonable interference with the use and enjoyment of the property" of the plaintiffs.  Id. at 856, quoting Doe v. New Bedford Hous. Auth., 417 Mass. 273, 288 (1994).  "Whether a nuisance exists is usually a question of fact."  Stevens v. Rockport Granite Co., 216 Mass. 486, 490 (1914).  "The law of nuisance 'does not concern itself with trifles, or seek to remedy all the petty annoyances of everyday life in a civilized community.'"  Rattigan, supra at 855-856,

12

quoting W.L. Prosser & W.P. Keeton, Torts § 88, at 626 (5th ed. 1984). Thus, a trier of fact may conclude that an annoyance which is sporadic does not constitute a nuisance. See Saldi v. Brighton Stock Yard Co., 344 Mass. 89, 95 (1962) ("sporadic" escapes of cows from stockyard did not constitute nuisance). Contrast Rattigan, supra at 863 (rejecting defendant's argument that his various offensive activities intended to harass neighbors were "sporadic"). Or a trier of fact may conclude that a landowner's actions in substantially reducing an annoyance rendered it no longer a substantial and unreasonable interference with the neighbors' enjoyment of their property. Cf. Rattigan, supra at 857-858 & n.15 (defendant could have accomplished goals by storing portable toilets and landing helicopter in area not immediately adjacent to plaintiffs' property). See also Trenz v. Norwell, 68 Mass. App. Ct. 271, 276 (2007). See generally Restatement (Second) of Torts § 830 (c) (1979).

   a. Computation of decibel levels. The plaintiffs argue that the sound coming from the Inn constituted a nuisance because it met the definition of noise pollution in DEP noise policy 90-001. The plaintiffs' expert acoustical engineer testified that the ambient noise level at the plaintiffs' property was forty-nine decibels measured on an A-weighted scale

13

(dBA).[9]  He explained that an increase of more than ten dBA above that ambient noise level, i.e., above fifty-nine dBA, would constitute a violation of DEP noise policy 90-001.

The plaintiffs illustrated their expert's testimony with thirty-four graphs depicting decibel measurements taken at their property on various dates.  Of those, five graphs depicted dBA measurements taken after construction of the vestibule.  The expert testified that a line on each of those thirty-four graphs labeled "Leq" depicted "roughly the average value" of sound. The judge asked the expert:

> THE COURT:  "So let me just clarify.  On each of these pages, does it indicate somewhere what the ambient is?"
>
> . . .
>
> PLAINTIFFS' EXPERT:  "[N]o. . . .  [T]his graph does not specifically have a line where the ambient is.  But, I mean, if you look at the X axis, obviously, if the ambient was 49 and the ten dB above is 59, you could probably just eyeball, you know, and look at the -- "
>
> THE COURT:  "To see what the average is?"
>
> PLAINTIFFS' EXPERT:  "Yes.  Or you could see how many instances above -- like 59 on this plot would be right about there."
>
> THE COURT:  "Okay."
>
> PLAINTIFFS' EXPERT:  "So if you just draw a line across here, you can see how many instances would be above . . . 59."

---

[9] The plaintiffs' expert explained that he took decibel measurements using equipment with an A-weighted scale, signified as dBA, which is the unit of measurement referenced in DEP noise policy 90-001.  The plaintiffs' own equipment used a C-weighted scale and could not be used to determine compliance with that policy.

14

THE COURT:  "I just didn't know if there was some -- if it was spelled out on there, or if you're just looking at what appears to be the average."

PLAINTIFFS' EXPERT:  "No.  The MaDEP -- my determination of the background at 10 dB is not on any of these graphs" (emphases added).

The judge found that the combined decibel readings were, on average, less than fifty-nine dBA, which is about the same as the sound of normal conversation or an air conditioner.[10]  The judge also found that the loudest sounds, generally audible once or twice each night for very brief periods, averaged about eighty-three dBA, which is about the same as the sound of a gas lawn mower or leaf blower.  From the video recordings depicting the rear of the Inn during music performances both before and after construction of the vestibule, the judge found that the vestibule "significant[ly] lessen[ed] . . . the volume of music outside the Inn."  We have reviewed the exhibits, including the five graphs depicting dBA measurements after the construction of the vestibule, and, on each of those graphs, the line labeled "Leq."  We do not discern any clear error in the judge's findings of fact.  See Rattigan, 445 Mass. at 855.

The plaintiffs argue that the judge's findings of fact were clearly erroneous because their expert did not testify to those

---

[10] At oral argument, the plaintiffs' counsel acknowledged that those readings spanned the period both before and after construction of the vestibule.

averages, and thus the judge must have arrived at them by looking at the graphs and "eyeballing only a selected number of peaks." They contend that because decibels are measured on a logarithmic scale, it would be impossible for the judge to compute averages because he did not have the raw data, only graphs depicting the data. On the contrary, the plaintiffs' expert testified that the line labeled "Leq" on each graph signified "roughly the average value," and suggested that the judge "eyeball" the graphs to determine whether they depicted readings above fifty-nine dBA. The plaintiffs did not meet their "heavy burden" to prove nuisance, Rattigan, 445 Mass. at 855, by providing the judge with incomplete data and then faulting him for interpreting the data as their expert suggested.

The plaintiffs also contend that the judge's findings were clearly erroneous because even a single reading above fifty-nine dBA would violate DEP noise policy 90-001 and thus support a finding of nuisance. We are not persuaded. As discussed above, a fact finder has considerable discretion in determining whether an annoyance constitutes a nuisance, see Rattigan, 445 Mass. at 859. The judge was not required to find that brief and intermittent increases in sound when the Inn's vestibule door was opened constituted a nuisance.

16

b.  DEP noise pollution regulation.  The plaintiffs argue that the judge erred in declining to apply the DEP noise pollution regulation, 310 Code Mass. Regs. § 7.10 (2001), in determining whether the defendants' use of the Inn constituted a nuisance.[11]  That regulation provides that it "shall not apply to sounds emitted during and associated with . . . parades, public gatherings, or sporting events, for which permits have been issued" (emphases added).  310 Code Mass. Regs. § 7.10(3) (2001).

Interpreting that language, the judge concluded that the Inn was not subject to 310 Code Mass. Regs. § 7.10(1) because its music performances were "public gatherings" and its common victualler's license authorizing it to present music constituted a "permit" within the meaning of § 7.10(3).  The plaintiffs argue that the judge erred as a matter of law because the categories of events listed in the regulation -- parades, public gatherings, or sporting events -- implied that the exemption applied to irregularly occurring, permitted events, not to an ongoing business such as a bar or restaurant.  We tend to agree.

---

[11] That regulation provides:  "(1) No person . . . controlling a source of sound shall willfully, negligently, or through failure to . . . take necessary precautions cause, suffer, allow, or permit unnecessary emissions from said source of sound that may cause noise."  310 Code Mass. Regs. § 7.10(1).  Noise is defined as "sound of sufficient intensity and/or duration as to cause or contribute to a condition of air pollution."  310 Code Mass. Regs. § 7.00 (2015).

"[W]ords are, at least in part, defined by the company they keep" (citation omitted), <u>Dorchester Mut. Ins. Co.</u> v. <u>Miville</u>, 491 Mass. 489, 495 (2023), and it is unlikely that "public gatherings" in the regulation was meant to include patrons at bars and restaurants.[12]

We need not definitively determine that issue, however. We note that a determination that the defendants' use of the Inn violated that regulation would not necessarily require a finding that the use amounted to a nuisance. And, in any event, we interpret the judge's findings to mean that he did apply DEP noise policy 90-001 when he found that the music emanating from the Inn did not, on average, exceed the fifty-nine dBA limit dictated by that policy, and the loudest sounds, generally audible once or twice each night for very brief periods, averaged about eighty-three dBA. With those findings, the judge implicitly found that the music was not "of sufficient intensity and/or duration," 310 Code Mass. Regs. § 7.00 (2015), to violate the DEP noise pollution regulation.

---

[12] Less convincing is the plaintiffs' argument that the music performances could not be public gatherings within the meaning of 310 Code Mass. Regs. § 7.10(3) because the Inn is privately owned, rather than being owned by a governmental entity. We doubt that whether property is publicly or privately owned controls the question whether an event held on the property constitutes a public gathering within the meaning of the DEP noise pollution regulation. The Inn is certainly a place of public accommodation, see G. L. c. 272, § 92A.

c. "Coming to the nuisance." The plaintiffs contend that the judge misapplied the doctrine of "coming to the nuisance," because he did not find sufficient facts as to the level of noise in 1995, when the plaintiffs bought 11 Water Street. The contention is unavailing. The judge found that the plaintiffs had patronized the Inn since the 1960s, and that they did not complain about noise from the Inn at any point during Goddu's ownership, which lasted until 2004, even though the noise then was louder and more raucous than under any other owner. The judge properly considered that the plaintiffs' nuisance claim was undermined by evidence that when they bought their properties in 1995 and 2000, they were aware of the effect of living near the Inn. See Escobar v. Continental Baking Co., 33 Mass. App. Ct. 104, 110 (1992). See also Stevens, 216 Mass. at

488 ("No one can move into a quarter given over to foundries and boiler shops and demand the quiet of a farm").[13]

Judgment affirmed.

By the Court (Englander,
  Grant & Brennan, JJ.[14]),

*Joseph F. Stanton*

Clerk

Entered:  April 19, 2023.

---

[13] The defendants' request for appellate attorney's fees and costs is denied.  "Although the . . . appeal is unsuccessful, it is not frivolous."  Perry v. Zoning Bd. of Appeals of Hull, 100 Mass. App. Ct. 19, 25 n.10 (2021), quoting Filbey v. Carr, 98 Mass. App. Ct. 455, 462 n.10 (2020).

[14] The panelists are listed in order of seniority.