JOHN E. RATTIGAN, JR., trustee,[1] & another,[2] *vs.* EVAN WILE,
individually & as trustee.[3]

Essex. November 8, 2005. - January 25, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Nuisance. Real Property,* Nuisance. *Damages,* Nuisance. *Res Judicata.
Injunction.*

In a civil action alleging private nuisance, the plaintiff property owners met
their burden of proving an unreasonable, intentional invasion of their
property interest, where the defendant's placement of items near the
plaintiffs' property was intended to harass his neighbors and the defendant's
landing his helicopter on his property was done in disregard of public
safety, so that the gravity of harm outweighed the utility of the defendant's
conduct [855-858]; moreover, the defendant's actions interfered with and
substantially harmed the plaintiffs' use and enjoyment of their property,
where the community was residential and implicitly intolerant of the
activities in which the defendant engaged, where expert opinion evidence
was presented to the effect that the defendant's activities would have a
negative effect on the rental value of the plaintiffs' property, and where the
defendant's interferences continued for several years [858-861].
In a civil action alleging private nuisance, the judge properly employed
diminution of rental value as a measure of damages, and also correctly
awarded recovery for the cost of building a barrier, but the judge erred in
awarding damages for periods prior to the beginning of the defendant's ac-
tions and after the defendant had been ordered to remove the offending
objects [861-863]; further, this court made minor adjustments to the
permanent injunction that the judge issued to prevent chilling wholly
legitimate uses of the defendant's property [863-864].
This court declined to address a claim of res judicata that the defendant in a
civil action had raised only in a pretrial memorandum, and even then only
in conclusory fashion. [863]

CIVIL ACTION commenced in the Superior Court Department on
February 14, 2001.

The case was heard by *Nancy Staffier,* J.

[1] Of the Edgewater House Trust.
[2] Jeffrey W. Horvitz.
[3] Of the West Street Realty Trust.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Sander A. Rikleen (John J. Griffin, Jr.,* with him) for the defendant.

*John Connolly, Jr. (Kevin P. Geaney* with him) for the plaintiffs.

Cowin, J. We conclude in this appeal that activities on one's property that create or maintain unreasonable aesthetic conditions for neighbors are actionable as a private nuisance. We need not reach the merits of the defendant's res judicata claim because it was not pleaded below. The judge properly awarded damages and issued an injunction, although we modify both slightly.

*Facts.* This case comes to us after a long history of litigation between the parties that culminated in a jury-waived trial in the Superior Court. We recite the facts found by the judge, supplemented as necessary by other undisputed evidence.

This matter involves two adjacent, prime oceanfront parcels located off West Street in Beverly Farms, an affluent residential section of the city of Beverly. Both properties directly abut a sandy beach and enjoy commanding views of the water. One plot is owned by the plaintiffs, John Rattigan and Jeffrey Horvitz,[4] while the other is owned by the defendant, Evan Wile. The property owned by the plaintiffs is commonly known as Edgewater and contains a luxurious residence, pool, and manicured grounds. The parcel owned by the defendant consists of approximately 2.9 acres of undeveloped land. The defendant's only land access is by right of way to West Street over land owned by the plaintiffs.

The plaintiffs purchased Edgewater at foreclosure auction in 1991. The next year the adjoining vacant property was also sold at foreclosure auction. The defendant outbid Horvitz for the parcel, and purchased with plans to build a home.[5] Herewith began the problems.

---

[4]Rattigan, as trustee for the Edgewater House Trust, is the title owner of the property, which he holds for the benefit of Jeffrey Horvitz, who resides there with his family.

[5]Wile purchased the parcel individually. Subsequently, he transferred it to the West Street Realty Trust, of which he is trustee and the sole beneficiary.

Rattigan subsequently brought actions on behalf of the Edge-water House Trust in the Land Court in or around 1992, seeking determinations that the defendant did not enjoy a right of way through Edgewater and that the defendant's land was not build-able under Beverly zoning bylaws.[6] These suits were ultimately unsuccessful and the defendant apparently regarded them, and other supplications to city officials that met with mixed success, as a form of "harassment." After Rattigan and Horvitz filed a successful challenge to the defendant's building permit,[7] the defendant embarked on a campaign of retaliation in August, 1999.

Between August, 1999, and July, 2003, the defendant placed a number of unusual objects at the edge of his lot, immediately adjacent to the boundary with the Edgewater property. The judge found that although the defendant, who is a building contractor, was undoubtedly aware that final resolution of the dispute concerning his building permit was hardly imminent, he dumped construction debris along the boundary line with Edge-water — broken concrete blocks, used pipe, and rusted metal components including a crane bucket. Later, the defendant brought onto the boundary a "gigantic, red, metal ocean container . . . use[d] to ship freight."

When Horvitz added barriers to shield those on his property from viewing the objects, first a few shrubs and then a six foot trellis fence (the maximum he believed he could build), the defendant "moved the construction debris inexplicably" so that the materials continued to be prominently in view. For example, after Horvitz erected the fence, the defendant responded "almost immediately" by moving "the largest pieces of the debris," including the crane bucket, to the top of the red container so that they would remain visible.[8] On a portion of the boundary of his property not protected by visual barriers, the defendant placed the detached bed of a pick-up truck that at one point held a large truck tire, and an unusual "wire frame or rack" from which hung a yellow detergent bottle and several plastic

---

[6]See *Rattigan* v. *Wile*, 46 Mass. App. Ct. 1103 (1998); *Rattigan* v. *Beverly*, 40 Mass. App. Ct. 1129 (1996).

[7]See *Wile* v. *Board of Appeals of Beverly*, 64 Mass. App. Ct. 1107 (2005).

[8]At some point, the city ordered the defendant to remove these objects.

figures including a duck, a goose, and an owl. A judge ordered the rack removed in a contempt proceeding related to this suit, see *infra*, in April, 2002.

Similarly, soon after Horvitz built a section of fence to shield swimmers at Edgewater's pool from apparent catcalls by individuals on the defendant's lot, the defendant responded by moving to his side of the fence "a trailer, like an office trailer . . . on a construction site," and elevating it on cinder blocks "so that the top windows loomed above the trellis fence." In 2001 and 2002, the defendant placed several portable toilets near the pool, so close that a person could not walk between the toilets and the Edgewater fence. The toilets generated an offensive odor that wafted over the pool. In the summer of 2002, the defendant placed a fifteen foot white and yellow striped tent also within a few feet of the Edgewater pool area, "obliterating any view and light from that direction." The city quickly ordered removal of the tent.

The judge found that there was no "logical explanation" for the defendant's failure to locate elsewhere many of the objects that appeared along Edgewater's boundary, except to "annoy, harass or otherwise create an offensive, harmful condition." The defendant's parcel was "a huge lot with multiple" locations where these items could have been placed. The fact that the tent and portable toilets were situated elsewhere during the summer of 2003 reinforced this determination.

Activity on the lot was also disconcerting. On occasions in the summers of 2001 and 2002, the defendant invited 150 to 200 people from a local youth center to a beach party. The defendant himself did not attend. The judge concluded that the invitation was "not born[] of a desire to be a charitable citizen in Beverly but, rather, was part of the campaign that was being waged against the Horvitzes to create a difficult and destructive neighborhood." The defendant intended the outing to be a recurring event but it was discontinued by the city because it was "disturbing the peace."

Between 1999 and 2002, the defendant, who is a licensed commercial helicopter pilot, used his property as a heliport. He posted a sign on the Edgewater fence near the pool deck, some distance away from the takeoff and landing site, that read in

bold red lettering, "WARNING HELICOPTER OPERATIONS[;] AUTHORIZED ACCESS ONLY." On "more than one" of the many helicopter touchdowns and liftoffs,[9] the helicopter's blades propelled small debris onto the Edgewater property; on one occasion, debris struck Horvitz's stepson, and on another, debris struck Horvitz's youngest daughter. By order of the Superior Court prior to trial, the defendant ceased landing on the plot but continued overflights to "check the property."[10]

The plaintiffs filed this action on February 14, 2001, and in July, 2001, following a hearing, obtained a preliminary injunction that enjoined the defendant from, among other things, flying his helicopter near Edgewater and "committing . . . acts . . . intended to harass . . . Horvitz, his family, his employees or his guests." Prior to trial, the defendant was twice adjudged to be in contempt of the injunction with respect to certain objects that he had placed along the property line.

On July 29, 2003, after a jury-waived trial, a judge of the Superior Court found that the defendant had created an actionable nuisance, and determined that the plaintiffs could recover for costs of abatement and temporary diminishment of the value of Edgewater. The judge credited testimony of an expert appraiser that the potential rental value of Edgewater for the thirteen weeks of the summer rental season declined from $8,000 per week to $2,000 per week as a result of the conditions that were caused by the defendant's activities. The judge awarded damages for each week of the summer rental seasons of 1999, 2000, 2001, 2002, and 2003, an aggregate of sixty-five weeks, totaling $390,000. In addition, the judge awarded damages of $19,200 for costs incurred installing the trellis fence. With interest, total recovery amounted to $532,035.05. The judge also issued a broad injunction, which she read from the bench:

"The defendant shall be permanently enjoined from do-

---

[9]The defendant appeared to be offering guests at his "large[] parties" "multiple helicopter rides."

[10]The defendant claimed to have Federal authority for his activities but produced no documentary evidence to support this claim.

ing anything or knowingly causing and/or permitting any activity to take place on or about his property that harasses plaintiff [Horvitz], his family or guests, or to commit, cause or permit any acts of harassment against plaintiff [Horvitz] or his family or guests. Harassment shall include any act that has the effect of causing substantial worry or annoyance or causing substantial offense to plaintiff [Horvitz], his family or other persons using and/or occupying the plaintiff's property. And this shall include the placement of objects, such as the tent, construction debris, [and] the trailer. This shall include not permitting large gatherings of children, people Mr. Wile doesn't even know . . . .

"The defendant shall within ten days clear any and all objects from, other than currently growing plant material, an area not less than twenty feet from all boundaries of the plaintiff's property. Further, there shall remain, other than currently growing plant material, nothing taller than six feet within an area of not less than forty feet from all boundaries of the plaintiff's property. The defendant shall thereafter allow nothing to be placed on [the] defendant's property[11] which violates the provision in this paragraph unless and until such time as [the] defendant obtains a valid building permit for any proposed structure on the defendant's land and which permit is no longer able to be subject to challenge or appeal or until he obtains authorization from a court of competent jurisdiction."[12]

The defendant appealed and we transferred the case to this court on our own motion.

*Nuisance.* We accept the trial judge's findings of fact absent clear error, but whether the plaintiffs met their burden on the claim of private nuisance is a question of law. See *Kuwaiti Danish Computer Co.* v. *Digital Elec. Equip. Corp.*, 438 Mass. 459, 470 (2003).

Our cases impose a heavy burden on the plaintiffs in such an action. The law of nuisance "does not concern itself with trifles,

---

[11]A reference to "plaintiff's property" was corrected to "defendant's property" as a result of a motion for clarification.

[12]Subsequent to the injunction, the defendant was again adjudged in contempt, and assessed a fine and attorney's fees. Resolution of another subsequent complaint of contempt is not reflected in the record.

or seek to remedy all the petty annoyances of everyday life in a civilized community." W.L. Prosser & W.P. Keeton, Torts § 88, at 626 (5th ed. 1984). See, e.g., *Wade* v. *Miller*, 188 Mass. 6, 7 (1905) ("Although the odor arising from the hen houses and yard, which at times was accompanied by the characteristic cry made by their occupants, may have been unpleasant," there was no actionable nuisance).

> "Life in organized society and especially in populous communities involves an unavoidable clash of individual interests. Practically all human activities unless carried on in a wilderness interfere to some extent with others . . . . Liability for damages is imposed [only] in those cases in which the harm or risk to one is greater than he ought to be required to bear under the circumstances, at least without compensation."

Restatement (Second) of Torts § 822 comment g, at 112 (1979). For this action to succeed, the plaintiffs must have shown that the defendant caused "a substantial and unreasonable interference with the use and enjoyment of the property" of the plaintiff.[13] *Doe* v. *New Bedford Hous. Auth.*, 417 Mass. 273, 288 (1994), quoting *Asiala* v. *Fitchburg*, 24 Mass. App. Ct. 13, 17 (1987). See *Hennessy* v. *Boston*, 265 Mass. 559, 561 (1929) (conduct actionable in nuisance if it would "deprive the plaintiff of the exclusive right to enjoy the use of [the] premises free from material disturbance and annoyance"). The injury or annoyance must have substantially interfered "with the ordinary comfort . . . of human existence," or have been substantially detrimental to the "reasonable use[] or value of the property." *Metropoulos* v. *MacPherson*, 241 Mass. 491, 502 (1922) (citations omitted).

The general rule is that a trier of fact may find an intentional invasion of another's interest in the use and enjoyment of land to be unreasonable if the "gravity of the harm" caused thereby

[13]The requirement that the interference with the use of land be "unreasonable" and "substantial" helps to distinguish nuisance from trespass, which may be actionable regardless of whether the conduct is reasonable or the harm measurable. See *Hennessy* v. *Boston*, 265 Mass. 559, 561 (1929); *Amaral* v. *Cuppels*, 64 Mass. App. Ct. 85, 90 (2005); Restatement (Second) of Torts § 821D comment d (1979).

"outweighs the utility" of the actor's conduct.[14] Restatement (Second) of Torts, *supra* at § 826(a). See 6A American Law of Property § 28.26 (A.J. Casner ed. 1952). Where an actor's "sole purpose" "is to annoy and harm his neighbor," the law recognizes no utility. Restatement (Second) of Torts, *supra* at § 829(a) & comment c. See 6A American Law of Property, *supra* at § 28.28. Such an action is unreasonable. Every landowner "is bound to use his own property in such a manner as not to injure the property of another, or the reasonable and proper enjoyment of it." *Wesson* v. *Washburn Iron Co.*, 95 Mass. 95, 104 (1866).

A trier of fact may also find a landowner's conduct to be unreasonable if the harm to a neighbor is substantial and "it would be practicable for the actor to avoid the harm in whole or part without undue hardship." Restatement (Second) of Torts, *supra* at § 830.

> "The question is not whether the activity itself is an improper, unsuitable or illegal thing to do in the place where it is being carried on, but whether the actor is carrying it on in a careful manner or at a proper time. The problem is whether the actor could effectively and profitably achieve his main objective in such a way that the harm to others would be substantially reduced or eliminated."

*Id.* at § 830 comment c. "The one whose conduct causes the invasion may be able to reduce or eliminate the harm without undue hardship, and if so, he is the one to do the avoiding." *Id.* at § 827 comment i.

In this case, the judge found that the defendant's placement of items near the plaintiffs' property was intended to harass his neighbors and that the helicopter landings were made in disregard of public safety. Even if the defendant had persuaded the judge that there was a mixed purpose to his actions, she also found with respect to many of the activities that the defendant's goals could have been accomplished without undue hardship in

---

[14]This rule applies to intentional conduct. The judge found that the defendant's conduct was intentional, and the defendant does not argue otherwise.

a manner that substantially reduced or eliminated the impact on Edgewater — for example, by utilizing areas of the expansive undeveloped lot not immediately adjacent to the plaintiffs' property.[15] It is obviously worthy of weight in the fact-finding calculus that this campaign was apparently waged in retaliation for the plaintiffs' recourse to legal process in the underlying dispute.

The question whether the defendant's activities interfered with and substantially harmed the plaintiffs' use and enjoyment of Edgewater, to the extent that a tort remedy is available, is a closer one. The defendant concedes that placement of the portable toilets and use of the helicopter on his land were traditional, actionable invasions. See, e.g., *Stevens* v. *Rockport Granite Co.*, 216 Mass. 486, 489-491 (1914) (noise); *Commonwealth* v. *Perry*, 139 Mass. 198, 201 (1885) (odor). However, he claims that these invasions existed during only a portion of the extended period for which the judge granted nuisance damages. He argues that as to the remainder of the period, for which only visual conditions persisted, there was no substantial, continuing "invasion of another's interest in the private use and enjoyment of land." Restatement (Second) of Torts, *supra* at §§ 821D, 821F, 822. See *Doe* v. *New Bedford Hous. Auth., supra.*

We interpret broadly one's right to use and enjoy his or her land. See *Hennessy* v. *Boston, supra; Metropoulos* v. *MacPherson, supra.* "Nuisances at common law frequently arise from offensive sights, sounds or smells." *General Outdoor Advertising Co.* v. *Department of Pub. Works*, 289 Mass. 149, 183 (1935). An actor need not "directly damage the land or prevent its use in order to constitute a nuisance." 58 Am. Jur. 2d Nuisances § 98 (2002). The landowner's interest "comprehends the pleasure, comfort and enjoyment that a person normally derives from the occupancy of land." Restatement (Second) of Torts, *supra* at § 821D comment b. This interest is informed by "[t]he location, character and habits of the particular

---

[15]It is the timing of the defendant's activities and the absence of any legitimate purpose that render the present case quite unlike the ordinary dispute in which the aesthetic or value preferences of neighbors merely differ. See Restatement (Second) of Torts, *supra* at § 828(a) (factoring social value of conduct).

community." *Id.* at § 821F comment e. See *Kasper* v. *H.P. Hood & Sons*, 291 Mass. 24, 27 (1935); 58 Am. Jur. 2d Nuisances, *supra* at §§ 102, 107. "[C]ontinuance or recurrence of the interference" will also factor in the determination. Restatement (Second) of Torts, *supra* at § 821F comment g. See *Stodder* v. *Rosen Talking Mach. Co.*, 241 Mass. 245, 250-251 (1922), *S.C.*, 247 Mass. 60 (1923) (talking machine's "continuous and monotonous playing of piece after piece" "substantially all day," on most days, actionable).

> "If normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable, then the invasion [suffices]. If normal persons in that locality would not be substantially annoyed or disturbed by the situation, then the invasion is not [actionable], even though the idiosyncracies of the particular plaintiff may make it unendurable to him."

Restatement (Second) of Torts, *supra* at § 821F comment d. These are all issues of fact, see, e.g., *Senatore* v. *Blinn*, 342 Mass. 778, 778 (1961) (noise and unsightliness), and it is often difficult for a trier of fact to determine whether an invasion is sufficiently substantial that an action in nuisance may succeed. See W.L. Prosser & W.F. Keeton, Torts, *supra* at § 88, at 627; Restatement (Second) of Torts, *supra* at § 821F comment d.

In the present case, the trial judge found that the community was residential and implicitly intolerant of the activities in which the defendant engaged. These findings were supported by expert opinion to the effect that one who might otherwise have rented Edgewater, if it had been offered for rent, would probably have declined to do so in light of the defendant's activities. The evidence also showed that the defendant's interferences continued for several years. Damages were ascertainable. See W.L. Prosser & W.P. Keeton, Torts § 88, at 627 ("Probably a good working rule would be that the annoyance cannot amount to unreasonable interference until it results in a depreciation in the market or rental value of the land"). Compare *Tortorella* v. *H. Traiser & Co.*, 284 Mass. 497, 502 (1933) (evidence that value declined insufficient without showing of extent). The judge's findings were not clearly erroneous.

Courts in other jurisdictions have reached similar conclusions. For example, in *Statler* v. *Catalano*, 167 Ill. App. 3d 397, 401-402, 405-406 (1988), the court affirmed nuisance damages on evidence that the defendants accumulated garbage for five years on the edge of their property nearest that of the plaintiffs, to annoy the latter, and occasionally shot bullets through the plaintiffs' windows; strategically positioned shooting trophies to taunt the plaintiffs; and intentionally reduced the level of a shared body of water. Likewise, in *Mark* v. *State Dep't of Fish & Wildlife*, 158 Or. App. 355, 361 (1999), *S.C.*, 191 Or. App. 563, 573-574 (2004), the court concluded that a finding of nuisance was permissible from evidence of "uncontrolled and intrusive" human nudity at the defendants' wildlife area, occurring in a location immediately around the plaintiffs' property. The court determined that a finding of nuisance would have been permissible even in the absence of evidence of a sexual component to the activity (which was a nuisance at common law), although this too was shown. *Id.* See *Kirkwood* v. *Finnegan*, 95 Mich. 543, 544 (1893) ("character and style" of fence made clear it was constructed in spite and thus actionable in nuisance); *Lee's Summit* v. *Browning*, 722 S.W.2d 114, 115-116 (Mo. Ct. App. 1986) (affirming trial court finding that automobile salvage yard was nuisance in part because salvage material was visible from street); *Yeager* v. *Traylor*, 306 Pa. 530, 532, 535 (1932) (proposed parking garage abutting residences of "expensive character" was nuisance that could be abated, in part, by use of screen to hide its "unsightly appearance"); *Foley* v. *Harris*, 223 Va. 20, 28-29 (1982) (sight of collection of several "junked . . . old, battered" automobiles actionable in nuisance); *Martin* v. *Williams*, 141 W. Va. 595, 601-602, 607-609, 612 (1956) (used car lot in residential neighborhood actionable in nuisance based, in part, on unsightliness).

Other courts forbid actions in nuisance that are based solely on unsightly conditions. See, e.g., *Coty* v. *Ramsey Assocs.*, 149 Vt. 451, 458 (1988), cert. denied, 487 U.S. 1236 (1988), *S.C.*, 154 Vt. 168 (1990) (court need not determine rule's continuing viability because case involved more than mere unsightliness). These courts distinguish cases where "more" than visually of-

fensive conditions were present. See *Wernke* v. *Halas*, 600 N.E.2d 117, 121-122 & n.6 (Ind. Ct. App. 1992). See also 58 Am. Jur. 2d Nuisances, *supra* at § 87. However, the modern trend is toward recognition that aesthetic considerations may legitimately generate public and private concern. See Note, Aesthetic Nuisance: An Emerging Cause of Action, 45 N.Y.U. L. Rev. 1075, 1080-1087 (1970); Note, Unaesthetic Sights as Nuisances, 25 Cornell L.Q. 1, 2 (1939); Note, The Modern Tendency Toward the Protection of the Aesthetic, 44 W. Va. L.Q. 58, 59-60 (1938). This court long ago decided that aesthetic considerations, standing alone, could support limitations on the use of land. See *General Outdoor Advertising Co.* v. *Department of Pub. Works*, *supra* at 182-187. Other courts have determined that the common law of nuisance permits suit on such incorporeal, value-based interferences as, among other things, disagreeable odors, obnoxious sounds, unreasonable illumination, disadvantageous blocking of light and air, and even undesired social influences from brothels, saloons, and gambling parlors. See Nagle, Moral Nuisances, 50 Emory L.J. 265, 276-299 (2001); Coletta, The Case For Aesthetic Nuisance: Rethinking Traditional Judicial Attitudes, 48 Ohio St. L.J. 141, 165-175 (1987). The invasion here was a composite of unpleasant odors, sounds, and visual conditions, and on this record the plaintiff established that the defendant's actions constituted a nuisance.

*Damages.* The defendant also advances several arguments with respect to the basis and magnitude of the damage award. He contends that diminution of rental value was an inappropriate measure of damages because the plaintiff never attempted to rent Edgewater. We disagree.

"The general rule for measuring property damage is diminution in market value." *Trinity Church in the City of Boston* v. *John Hancock Mut. Life Ins. Co.*, 399 Mass. 43, 48 (1987), *S.C.*, 405 Mass. 682 (1989). "[W]here damage to real property is not permanent, the measure of recovery is the reasonable expense of repairing the injury plus the intervening loss of rental value for the period reasonably needed to repair the injury." *Guaranty-First Trust Co.* v. *Textron, Inc.*, 416 Mass. 332, 337 (1993). Diminution in rental value is an injury for which the occupant of the property at the time of the interfer-

ence may recover.[16] See *Wolfberg* v. *Hunter*, 385 Mass. 390, 398, 400 (1982) (damages pursuant to G. L. c. 93A, § 9); *Harrison* v. *Textron, Inc.*, 367 Mass. 540, 556 (1975).

The judge also awarded $19,200, representing the cost of the trellis fence built by Horvitz as a barrier. The defendant argues that because the fence did not succeed in eliminating the defendant's interference with Edgewater, recovery of its cost was improper. However, the appropriate inquiry is whether, in the circumstances, the cost incurred for the fence was a reasonable response to the defendant's behavior. See *Guaranty-First Trust Co.* v. *Textron, Inc.*, *supra*. That is not measured by whether the fence actually succeeded in its purpose, particularly when the defendant took action to thwart it.

The defendant also objects to the award of damages for those periods during which there was no evidence of nuisance and for those periods during which the judge deemed the interference insignificant. Damages were assessed for all thirteen weeks of the summer rental season of 1999, although the defendant began his campaign of harassment only in August of that year. In addition, the judge issued her findings of fact and rulings of law on July 29, 2003, and the defendant was ordered to remove the offending objects within ten days,[17] but damages were nonetheless awarded for all of August, 2003. The plaintiff does not expressly contend otherwise. Thus, we are satisfied that the period for which damages are awarded should be reduced from sixty-five weeks to fifty-three weeks (subtracting nine weeks for June and July, 1999, and three weeks for the period in August, 2003, commencing within ten days after the issuance of the removal order). Thus, the rental value portion of the damage award should be reduced correspondingly from $390,000 to $318,000.

Finally, the defendant argues that the magnitude of the damage award was "unprecedented" and did not take into account

---

[16]The case of *Nassr* v. *Commonwealth*, 394 Mass. 767, 769, 771-772 (1985) (plaintiff whose lessee contaminated land with "liquid lagoon" of explosive hazardous waste could not recover against Commonwealth, which entered to clean site), cited by the defendant, is inapposite.

[17]The defendant does not argue that the injury could have been "repaired," see *Guaranty-First Trust Co.* v. *Textron, Inc.*, 416 Mass. 332, 337 (1993), more quickly than ten days after judgment.

.

the fact that many of his offensive activities were sporadic and did not continue during the entire period for which damages were awarded. For example, the office trailer was positioned at the boundary of Edgewater only in June, 2001. Nevertheless, we are satisfied that the award was supported at trial by duly qualified expert opinion, which the defendant did not rebut, and flowed from evidence of a single, hostile, continuous, four-year campaign of interference with the use and enjoyment of the plaintiffs' valuable real estate. There was no error.

*Res judicata.* The defendant, on appeal, asserts a novel defense raised below only in his pretrial memorandum, and even there only in conclusory fashion: that two prior adjudications of contempt with respect to the preliminary injunction, in which the judge declined to make certain findings favorable to the plaintiffs, barred the subsequent decision for the plaintiffs on elements of the underlying nuisance claim. We need not address the merits of this argument because it was not adequately raised below.

Res judicata is an affirmative defense that must be set forth "[i]n pleading to a preceding pleading." Mass. R. Civ. P. 8 (c), 365 Mass. 749 (1974). A pretrial memorandum is not a pleading. See Mass. R. Civ. P. 7 (a), as amended, 385 Mass. 1215 (1982); 5 C.A. Wright & A.R. Miller, Federal Practice & Procedure § 1183, at 22-23 (2004). "The failure to comply with [rule 8 (c)] is, without more, sufficient reason for holding that the defense[] . . . [is] not now open to the defendant[]." *Middlesex & Boston Ry.* v. *Aldermen of Newton,* 371 Mass. 849, 859 (1977). See *Anthony's Pier Four, Inc.* v. *HBC Assocs.,* 411 Mass. 451, 471 (1991). Compare *Demoulas* v. *Demoulas,* 428 Mass. 555, 575 n.16 (1998) (no waiver for failure to comply with rule 8 (c) where adequate notice of defense was given and issue was argued by both parties in briefs and at motion hearing).

*Injunction.* Given the defendant's creativity in persisting with his campaign of nuisance, the expansive nature of the injunction issued by the trial judge was understandable. The judge handled a difficult case well. Nevertheless, the defendant argues, and we agree, that the breadth of the injunction and the emphasis on the subjective effects of the defendant's actions raise concern that it

may chill wholly legitimate uses of the almost three acre property. For example, the injunction prohibited any act that would cause "substantial worry" to the plaintiffs, but given the history between the parties, it appears likely that even the most reasonable of the defendant's actions might cause the plaintiffs consternation. Thus, we make minor amendments so that the injunction provides as follows.

The defendant is permanently enjoined from unreasonably interfering with the use and enjoyment of the plaintiffs' property. Without limiting the scope of the foregoing prohibition, the defendant shall not leave unattended any objects more than six feet in height within forty feet of the plaintiffs' boundary line, such as tents, portable toilets, construction and industrial materials, trailers, and warning signs, except reasonable vegetation. The defendant shall not operate, or cause to be operated, a helicopter on his property or within the zone of interest above the property.[18] So long as the above provisions are not violated, the defendant shall not be enjoined from hosting gatherings on his property that he personally attends. This injunction is not intended to impede the defendant's ability to build on the property at issue; if he obtains lawful authority to build, he may seek modification of this injunction in the Superior Court.

*Conclusion.* For the foregoing reasons, judgment for the plaintiff is to be entered in the amount of $337,200 ($318,000 in diminished rental value and the $19,200 cost of the fence) plus interest. The injunction is modified as set forth above.

*So ordered.*

---

[18]See *United States* v. *Causby*, 328 U.S. 256, 262-267 & n. 7 (1946) (regular operation of military aircraft eighty-three feet above private land implicated landowner interests); *Burnham* v. *Beverly Airways, Inc.*, 311 Mass. 628, 636-637 (1942) (operation of aircraft below normal limit of "navigable air space" may implicate landowner rights). See also *Penn Cent. Transp. Co.* v. *New York City*, 438 U.S. 104, 128, 143 n.5 (1978) (collecting cases). Compare 14 C.F.R. § 91.119 (2005) (prescribing minimum operating altitude of 500 to 1,000 feet, depending on character of location, and allowing generally for operation of helicopters below minimum if "operation is conducted without hazard to persons or property on the surface.")

## NOTE.

The next page is purposely numbered 1001. The intervening page numbers were intentionally omitted in order to make it possible to publish this material with *permanent* page numbers, thus making official citations available upon publication of the preliminary prints of these Reports.