NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

23-P-629                                           Appeals Court

P.J. KEATING COMPANY  vs.  TOWN OF ACUSHNET & others[1]
(and a consolidated case[2]).

No. 23-P-629.

Bristol.     December 4, 2023. – April 12, 2024.

Present:  Meade, Massing, & Sacks, JJ.

Practice, Civil, Action in nature of certiorari.  Nuisance.
    Municipal Corporations, Board of health, Nuisance.  Real
    Property, Nuisance.

Civil actions commenced in the Superior Court Department on September 15 and September 22, 2022.

After consolidation, the cases were heard by Susan E. Sullivan, J., on motions for judgment on the pleadings.

Jonathan G. Murray for the defendants.
Luke H. Legere for the plaintiff.

SACKS, J.  The board of health of the town of Acushnet

(board), invoking its authority under G. L. c. 111, §§ 122-125,

_____

[1] Board of health of Acushnet, assistant health agent of Acushnet, and health agent of Acushnet.

[2] Board of Health of Acushnet vs. P.J. Keating Company.

to eliminate nuisances within the town, issued a cease and desist order requiring the P.J. Keating Company (PJK), owner of a recently relocated hot-mix asphalt plant in Acushnet, to halt operations that caused noxious odors and fumes to spread beyond PJK's property. In its order, issued after an evidentiary hearing, the board found that the emissions caused nearby homeowners to suffer burning eyes, noses, and throats. On PJK's complaint for judicial review, a Superior Court judge ruled that the order was unsupported by substantial evidence and was arbitrary and capricious, and judgment entered reversing the board's decision. The judge also dismissed a separate action brought by the board against PJK to enforce the order.[3] On the board's appeal, we conclude that its order was valid. We therefore reverse the judgment annulling the order, and we vacate the judgment dismissing the board's enforcement action and remand for such further enforcement proceedings as may be necessary.

Background. PJK operates a hot-mix asphalt plant and quarry on its 381.3-acre parcel located at 72 South Main Street in Acushnet, in an area zoned for industrial use.[4] PJK and its

---

[3] The two actions were consolidated in the Superior Court.

[4] Our statement of background facts is primarily drawn from matters reflected in the record of board proceedings, as well as certain facts alleged in PJK's and the board's Superior Court complaints that do not appear to be in dispute.

predecessors have operated the quarry since the 1890s and an asphalt plant since the 1950s. Between 2018 and 2021, PJK constructed a new asphalt plant on a part of the property that is closer to residential neighborhoods and to South Main Street.

1. Odor complaints. In September 2021, after PJK began operations at the new plant, homeowners complained to the board about odors emanating from PJK's property; some homeowners reported burning sensations in their noses. The board issued a "nuisance odor notification" to PJK. In response, PJK stated that, although its operations created no health risks, it was taking steps to reduce odors and would investigate any complaints of which it learned.

In April 2022, the board received numerous complaints of odors, headaches, nausea, dizziness, and "a general fear of being outdoors." The board's assistant health agent investigated and confirmed the presence of "nuisance odors" at residences on three streets near the plant, as well as at the town's senior center.

2. Board proceedings. The assistant health agent notified PJK of these findings and ordered PJK to cease and desist from operating the plant and to remedy the cause of the odors. The order cited the board's authority under G. L. c. 111, § 122, to

investigate and prevent nuisances.[5]  The order informed PJK of its right to a hearing, and PJK requested one.

The board scheduled an evidentiary hearing for June 2022. In advance of the hearing, PJK submitted substantial materials for the board's consideration.  At the hearing, PJK was represented by counsel.  Numerous residents testified about the adverse effects of odors and fumes from the plant, as did the board's assistant health agent.  Representatives of PJK also testified and answered questions from board members.  After the testimonial portion of the hearing, the board kept the record open to allow PJK to submit additional evidence.  We reserve for later discussion the range of evidence before the board.

In its final decision, the board found that "the odor originating from [PJK's property] caused neighboring property owners to be prevented from enjoying the outside of their properties because of the smell and burning of their eyes, nose and throat due to the odor and noxious air produced by the [asphalt] plant."  The board concluded that the plant was a

---

[5] The order also alleged a violation of a Department of Environmental Protection (DEP) air pollution control regulation, 310 Code Mass. Regs. § 7.09 (2002).  The terms of that regulation authorize enforcement by local boards of health, among others.  310 Code Mass. Regs. § 7.09(7) (2002).  See 310 Code Mass. Regs. § 7.52 (2018).  DEP's final air quality plan approval was also conditioned on PJK's avoidance of "nuisance conditions" that would violate § 7.09.  Because the board's final decision did not rely on those regulations, however, we do not discuss them further.

"nuisance, source of filth[,] and cause of sickness," see G. L. c. 111, § 123, and it ordered PJK to cease and desist from any operations that caused noxious odors and fumes to spread beyond the boundaries of PJK's property.

3. Superior Court proceedings. PJK sought review of the board's order in the Superior Court, citing G. L. c. 30A, § 14, as the basis for such review. The board, for its part, commenced a separate Superior Court action to enforce its order. On the board's motion, a judge issued a preliminary injunction requiring PJK to comply with the order. The actions were then consolidated, the board filed the record of its proceedings, and PJK moved for judgment on the pleadings to reverse the board's order.

A different judge considered the motion and, in response to the board's argument that review under G. L. c. 30A was unavailable, treated PJK's request for review as arising instead under the certiorari statute, G. L. c. 249, § 4. The judge then rejected the board's finding that the plant was a nuisance. She reasoned that "the odor does not occur all of the time and is exacerbated during certain weather conditions"; that the odor did not affect all or any significant portion of the town's residents, but merely certain neighbors of the plant; and that the plant was in an industrial-zoned area and had passed all inspections.

The judge further ruled that, even if the plant was a nuisance, the board's order was still invalid, because "there was no credible evidence before the [b]oard that the odor was injurious to the public health," nor had the board made any such finding. The judge therefore ruled that the board's order was arbitrary and capricious and unsupported by substantial evidence. On PJK's complaint for judicial review, she ordered judgment reversing the board's order, and on the board's enforcement claim, she ordered judgment dismissing the complaint. This appeal by the board followed.

Discussion. 1. Basis for judicial review. We first address the board's contention that the Superior Court had no jurisdiction to review the board's decision under G. L. c. 30A, as sought in PJK's complaint. Although the board is correct that c. 30A does not apply, it does not follow that, as the board argues, the judge was required to dismiss the complaint for lack of subject matter jurisdiction. Instead, because (1) board of health adjudicatory decisions are reviewable under the certiorari statute, G. L. c. 249, § 4; (2) PJK sought review within the sixty-day period established by that statute; and (3) the board suffered no prejudice, the judge properly treated PJK's complaint as seeking certiorari review.

The board is not an "agency" as that term is defined in G. L. c. 30A, § 1 (2), and thus the board's decision is not

reviewable under c. 30A.[6]  See Robinson v. Board of Health of

Chatham, 58 Mass. App. Ct. 394, 395 n.4 (2003).  But, because

PJK challenges the board's essentially adjudicatory decision in

an individual case, certiorari review is available.[7]  See Frawley

v. Police Comm'r of Cambridge, 473 Mass. 716, 725 (2016).

Indeed, the board acknowledges that certiorari is appropriate to

obtain review of nuisance abatement orders.[8]  We have previously

---

[6] Statutes governing specific types of decisions by local boards of health may nevertheless expressly provide for c. 30A review.  See G. L. c. 111, § 150A, ninth & twelfth pars. (board of health decisions concerning solid waste disposal facility site assignments).

[7] "To obtain certiorari review of an administrative decision, the following three elements must be present:  (1) a judicial or quasi judicial proceeding, (2) from which there is no other reasonably adequate remedy, and (3) a substantial injury or injustice arising from the proceeding under review." Indeck v. Clients' Sec. Bd., 450 Mass. 379, 385 (2008).

[8] Although neither party cites it, we acknowledge the Supreme Judicial Court's broad statement some years ago that a board of health's nuisance abatement order under G. L. c. 111, §§ 122-125, "is not subject to a review or any proceedings brought by [the target of the order] solely for that purpose." DeVincent v. Public Welfare Comm'n. of Waltham, 319 Mass. 170, 171 (1946).  DeVincent and the cases it relied on, however, considered only whether review of board decisions was available under statutes specifically applicable to such boards, rather than under the certiorari statute, which relies on the unavailability of other remedies.  See id.; Tracht v. County Comm'rs of Worcester, 318 Mass. 681, 683-685 (1945); Kineen v. Board of Health of Lexington, 214 Mass. 587, 590 (1913); Stone v. Heath, 179 Mass. 385, 387-388 (1901).  "[O]nly words unmistakable in import will express a legislative purpose to deprive parties" of the availability of certiorari review (quotation and citation omitted).  Revere v. Massachusetts Gaming Comm'n, 476 Mass. 591, 597 (2017).  Further, in Stone the court held that board of health nuisance abatement orders are

ruled that a claim for judicial review erroneously labeled as seeking a declaratory judgment may be treated instead as seeking certiorari review, where such review is available and appropriate.[9] See Grady v. Commissioner of Correction, 83 Mass. App. Ct. 126, 135-136 (2013). We do the same with the mislabeled c. 30A claim here.

2. Merits. We begin by setting forth the standards for certiorari review. We then discuss the authority of a local board of health to investigate and order the abatement of public nuisances, and how that authority affects the nature of our review. Finally, we discuss the evidence before the board and the validity of the resulting cease and desist order.

a. Certiorari review. Although "the proper standard of review under the certiorari statute is flexible and case specific, . . . as with review under G. L. c. 30A, § 14, . . . ultimately [the review must] turn on whether the agency's decision was arbitrary and capricious, unsupported by

_____

not reviewable "before they [can] be carried into effect," Stone, supra at 387, but are reviewable, among other ways, in enforcement proceedings, id. at 388, such as the board commenced here.

[9] We are "mindful that 'there is no requirement that a complaint state the correct substantive theory of the case,' and that '[a] complaint is not subject to dismissal if it would support relief on any theory of law' (citation omitted)." Haas v. Commissioner of Correction, 103 Mass. App. Ct. 1, 6 (2023), quoting Gallant v. Worcester, 383 Mass. 707, 709-710 (1981).

substantial evidence, or otherwise an error of law."  Hoffer v.
Board of Registration in Med., 461 Mass. 451, 458 n.9 (2012).
See Murphy v. Commissioner of Correction, 493 Mass. 170, 173
(2023); Revere v. Massachusetts Gaming Comm'n, 476 Mass. 591,
604-605 (2017).  Because we are reviewing the same record of
board proceedings as was before the Superior Court, "we review
the record . . . without giving the view of the Superior Court
judge any special weight."  Doe v. Superintendent of Sch. of
Stoughton, 437 Mass. 1, 5 (2002).  See Macero v. MacDonald, 73
Mass. App. Ct. 360, 366 (2008).

b.  Authority of local board of health.  Under G. L.
c. 111, § 122, a local "board of health shall examine into all
nuisances, sources of filth and causes of sickness within its
town . . . which may, in its opinion, be injurious to the public
health, [and] shall destroy, remove or prevent the same as the
case may require."  The board "shall order the owner or occupant
of any private premises, at his own expense, to remove any
nuisance, source of filth or cause of sickness found thereon
within twenty-four hours, or within such other time as it
considers reasonable, after notice."[10]  G. L. c. 111, § 123.

---

[10] "If the owner or occupant fails to comply with such
order, the board may cause the nuisance, source of filth or
cause of sickness to be removed, and all expenses incurred
thereby . . . shall be recoverable from such owner or occupant
in an action of contract."  G. L. c. 111, § 125.

Thus, "[b]oards of health have plenary power . . . to remove or prevent nuisances, sources of filth and causes of sickness." United Reis Homes, Inc. v. Planning Bd. of Natick, 359 Mass. 621, 623 (1971).

The board here focused on whether PJK was causing a public rather than a private nuisance.[11] "[A] nuisance is public when it interferes with the exercise of a public right by directly encroaching on public property or by causing a common injury" (citation omitted).[12] Sullivan v. Chief Justice for Admin. & Mgt. of the Trial Court, 448 Mass. 15, 34 (2006). "A public nuisance is an unreasonable interference with a right common to the general public," and when a court is asked to find a public nuisance, "[the] court may consider, inter alia, '[w]hether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience.'" Id., quoting Restatement (Second) of Torts § 821B (1979) (Restatement § 821B). A public nuisance includes an interference "with the public comfort, as in the

---

[11] A board of health may investigate and act against "all nuisances," G. L. c. 111, § 122, and may order the abatement of "any nuisance." G. L. c. 111, § 123. The exact reach of this language is not before us.

[12] A private nuisance, in contrast, occurs when a defendant "cause[s] a substantial and unreasonable interference with the use and enjoyment of the property of [another]" (quotation and citation omitted). Rattigan v. Wile, 445 Mass. 850, 856 (2006).

case of widely disseminated bad odors, dust and smoke." Restatement § 821B comment b. "Whether a nuisance exists ordinarily is a question of fact"; "[e]ach case must depend upon its own facts and no rule can be formulated which will be applicable to all cases." Strachan v. Beacon Oil Co., 251 Mass. 479, 485, 487 (1925).

What matters here is not whether we think PJK's operations caused a public nuisance but, instead, whether the board could properly so conclude. On certiorari review, as on G. L. c. 30A review, "[i]t is for the agency, not the courts, to weigh the credibility of witnesses and to resolve factual disputes. A court may not displace an administrative board's choice between two fairly conflicting views, even [if] the court would justifiably have made a different choice had the matter been before it de novo" (citation omitted). Perisho v. Board of Health of Stow, 103 Mass. App. Ct. 593, 600 (2023).

Moreover, here the governing statute directs the board to "examine into all nuisances . . . and causes of sickness within its town . . . which may, in its opinion, be injurious to the public health" (emphasis added). G. L. c. 111, § 122. Although the board's opinion is not conclusive, the language of § 122 reinforces that we owe deference to the board's view of what constitutes a public nuisance.

A further consideration in reviewing a board of health decision is that "[b]oards of health are likely to be composed of laymen not skilled in drafting legal documents, and their orders should be read with this fact in mind.  They should be so construed as to ascertain the real substance intended and without too great attention to niceties of wording and arrangement."  Board of Health of Wareham v. Marine By-Products Co., 329 Mass. 174, 177 (1952).  Thus, the Supreme Judicial Court has declined to decide "to what extent, if at all, a board of health . . . is bound to make express findings of facts required to support its order."[13]  Id.  It is sufficient if a board's order may be "properly construed" to contain the necessary statements.  Id.  "It is the substance of the matter dealt with by the board of health that is to be regarded rather than forms and words."  Kineen v. Board of Health of Lexington, 214 Mass. 587, 591 (1913).

c.  Validity of board's order.  We now review the evidence before the board.  We conclude that the board's order was

_____

[13] Although the court in Board of Health of Wareham was addressing board action under G. L. c. 111, § 143, we think the principle is applicable here.  At issue in in that case was a board's authority to prohibit, within a city or town, any "trade or employment which may result in a nuisance or be harmful to the inhabitants, injurious to their estates, dangerous to the public health, or may be attended by noisome and injurious odors," except at such locations, if any, as the board may assign.  G. L. c. 111, § 143.  See Board of Health of Wareham, 329 Mass. at 176-177.

supported by substantial evidence and was neither arbitrary and capricious nor based on any error of law.  See Hoffer, 461 Mass. at 458 n.9.

i. PJK's submissions.  In advance of the board hearing, PJK submitted a variety of materials regarding the relocated plant.  These included the Department of Environmental Protection's (DEP) final air quality plan approval, as well as a town building permit, certificate of project completion, and supporting engineering reports.  PJK also submitted four government and industry reports that showed, according to PJK, that "odors and fumes from asphalt production pose no health risk to PJK's employees or neighboring residents."  Those reports, however, did not support PJK's sweeping assertion.

First, PJK submitted a 2002 notice from the United States Environmental Protection Agency (EPA) announcing that it had removed asphalt concrete manufacturing plants from the listing of "major sources" of hazardous air pollutant (HAP) emissions that EPA maintains under the Federal Clean Air Act (CAA).  See 42 U.S.C. § 7412.  That statute, however, generally defines "major source" as a stationary source that emits a volume of ten or more tons per year of HAP.[14]  Nothing in the 2002 notice

---

[14] "Major source" is generally defined for CAA purposes as "any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the

suggested that where a source is not a "major source" of HAP, that means that it emits no HAP or poses no health risk.

Second, PJK offered a 2007 study of seven asphalt plants around the country, conducted by an agency within the United States Department of Health and Human Services (HHS). PJK highlighted the study's conclusions that, in the categories of volatile organic carbons, polycyclic aromatic hydrocarbons, hydrogen sulfide, and particulates, "there do not appear to be any chemicals or compounds at levels that would pose a public health hazard." The HHS study also concluded, however, that in communities near asphalt plants, among "the compounds most capable of posing a health hazard" were sulfur dioxide and nitrogen oxides; that sulfur dioxide was "highly reactive and at sufficiently high levels can cause irritation to the eyes and upper respiratory system"; and that sulfur dioxide and nitrogen oxides "ranked higher than [hydrogen sulfide] in their degree of toxicity, potential health risk and/or odor." Further, the study found that "there remains a data gap for evaluating"

---

aggregate, 10 tons per year or more of any [HAP] or 25 tons per year or more of any combination of [HAPs]." 42 U.S.C. § 7412(a)(1). Any stationary source of HAP that does not emit at least those levels of HAP is defined as an "area source." 42 U.S.C. § 7412(a)(2). Area sources are subject to regulation under the CAA. See, e.g., 42 U.S.C. §§ 7412(c)(3), (5); 7412(d)(1), (5).

whether those substances were present at hazardous levels near asphalt plants.

Third, PJK cited a 2016 document from the California Environmental Protection Agency's carcinogen identification committee. The committee recommended that, for purposes of action under California's Safe Drinking Water and Toxics Enforcement Act of 1986, asphalt and asphalt emissions associated with road paving should be assigned a "low" priority. In the same document, however, the committee recommended that asphalt and asphalt emissions associated with roofing be assigned a "medium" priority. The document did not make any recommendation regarding asphalt manufacturing plants or regarding health effects other than cancer.

Fourth and finally, PJK cited a 2018 report prepared by a private engineering firm for the National Asphalt Pavement Association. The report compared emissions from asphalt pavement mixture plants with other emission sources including wood stoves, bakeries, and gasoline stations. The report concluded that an asphalt plant causes the average outdoor ambient air level of smaller particulates (less than 2.5 microns in diameter) to increase by only four percent at a distance of 1,000 feet from a plant's "dryer stack." The report stated that this was less than the impact that heating a home with a wood stove would have on particulate levels inside the home. The

report contained only a brief mention of the health effects of asphalt plant emissions.[15]

PJK's prehearing submissions also included a map and chart of complaints about odors from PJK's plant. These materials showed that nineteen different households had filed eighty-one odor complaints since September 2021. PJK emphasized that fifty-six of the complaints had come from the same nine households, which the map showed were located to the north, south, or west of PJK's plant. (To the east of the plant is PJK's quarry and a large uninhabited area.) PJK thus asserted that "the vast majority of complaints come from the same handful of residents." PJK further asserted that its personnel had investigated and were unable to confirm many of the complaints, and that other complaints were made in the hours before or after plant operations and thus could not be attributed to the plant.

PJK thus argued that it appeared the persons complaining were either "abnormally sensitive to these particular odors, or [were] suffering physical or mental ailments not attributable to the odors," particularly given that "the general health of the

---

[15] The report stated only that studies indicated greater concern over the potential adverse health effects of smaller particulates as compared to larger particulates. The report did not otherwise address the health effects either of particulates or of any of the other asphalt plant emissions -- formaldehyde, polycyclic aromatic hydrocarbons, and benzene -- that were a particular focus of the report.

many employees [at PJK] . . . has been good."  PJK quoted these phrases from Strachan, 251 Mass. at 484, and asserted that, like the oil refinery held not to be a private nuisance in Strachan, PJK's asphalt plant could not constitute a nuisance.

Although not mentioned by PJK, the chart reflected complaints not merely from residents of nearby homes but also from persons using South Main Street (the road in front of PJK's plant), persons patronizing nearby businesses, and persons located three-quarters of a mile or a mile away from the plant.

ii.  Evidence at board hearing.  At the hearing, the assistant health agent offered in evidence copies of additional odor complaints submitted by residents.  These included complaints from twenty-two additional households beyond the nineteen already represented in PJK's chart.  The complaints concerned odors at homes, in neighborhoods, on roads, and at a school bus stop during drop-off time.

The board then heard testimony from residents.  Six residents (including two not represented in the written complaints) testified about odors from the plant itself.  One of those six, as well as a seventh resident, also testified about

odors coming from insufficiently covered trucks carrying hot asphalt out of the plant onto nearby roads.[16]

The residents described the odors as "horrific," "atrocious," and "offensively strong and pungent."  Four residents testified that the odors caused their eyes to burn or water, three reported burning or irritation to their noses or sinuses, two reported sore throats, one reported nausea and dizziness, and another reported slight headaches.  Six testified that the odors made them go or stay inside and interfered with their use or enjoyment of their properties.  A seventh testified that she no longer sat outside in front of her home because of fumes and odors from the freshly loaded trucks.

The residents further testified that the odors were not merely brief conditions that came and went in a matter of minutes.  They were a problem several days per week or more, depending on wind conditions.[17]  Several residents expressed concern about their own health and that of their families or their neighbors.

---

[16] Another resident testified that he had previously had issues with the odor, but that at the time of the hearing, it was not a problem, because the plant was not operating.

[17] The assistant health agent testified that some of the complaints he investigated were for "fleeting odors you get for five minutes . . . [a]nd then maybe ten minutes later, it comes back again."

Most of the residents agreed that the problem had become substantially worse since PJK relocated the plant to the front of its property, i.e., closer to "where it's very residential." Two residents stated that they understood PJK had to operate its business but that PJK also needed to be a "good neighbor[]."

The assistant health agent testified that when he went to investigate conditions near the plant, the odor was "horrendous," lasted throughout his fifteen-minute visit, made his eyes water, and left him feeling dizzy for one-half hour after leaving the site. He had received some training from DEP on detecting nuisance odor, including on the use of a seriousness scale of one to seven. He testified that at the home of one resident, he rated the odor as level four, but at another home he rated the odor as a seven for the duration of his visit, a "full-on assault of . . . stink."

The assistant health agent also suggested that when the plant had been located at the back of PJK's property, there was more time for fresh asphalt loaded into trucks to cool down, and for fumes to dissipate, before the trucks came close to residences. With the relocated plant, however, he could observe fumes coming off of trucks as they were being loaded, after which they immediately drove onto South Main Street, full of hot asphalt and with inadequate coverings.

PJK, for its part, emphasized that it was operating in compliance with zoning regulations and that its employees had not experienced the types of effects to which the residents had testified. PJK acknowledged that all asphalt plants emitted odors but asserted that the four reports it had submitted showed that asphalt "does not cause" watery eyes or throat symptoms.

PJK asserted that it was operating under "the strictest permit the DEP has ever issued for hot asphalt plants," using "best available control technology" to limit dust, noise, and odor. In response to a board question about how often DEP inspected the plant, PJK stated that DEP could inspect whenever it wished to do so. When pressed, however, PJK stated that DEP had not actually made any unannounced inspection of the plant since its relocation, nor was PJK aware of any scheduled inspection having occurred.

PJK also answered questions from board members about plant operations. PJK assured the board that the plant's "blue smoke" filter system was operated every day and maintained weekly.[18] Although one resident testified that he could "literally see the emissions wafting through [his] neighborhood," PJK's environmental compliance manager stated that this was

---

[18] A document submitted by PJK explained that "[b]lue smoke is an aerosol mist comprised primarily of hydrocarbons that have vaporized from liquid asphalt cement."

impossible, because PJK's emissions were required to meet opacity standards.  He agreed, however, that fumes would be visible as trucks were being loaded with asphalt.  Asked whether those trucks were properly covered when they left the plant, PJK asserted that no truck could leave the property without a tarp, but that PJK could increase its inspections of the adequacy of the tarps being used.

   iii.  Additional submissions.  After hearing the above testimony, the board held the record open for additional submissions.  PJK subsequently submitted documentation of its air quality modeling approach, its best available control technology, and its request to DEP for an extension of time to complete compliance testing.  PJK also submitted materials documenting its blue smoke control system and its truck tarp inspections.

   The board retained an industrial hygienist to review the evidence submitted up to that point.  The industrial hygienist's report concluded that the complaints from nearby residents supported a finding that PJK was creating or contributing to a nuisance, and that research showed a correlation between plant emissions and public health.  The report recommended that PJK verify the functioning of all plant controls; that strict requirements for truck coverings be enforced in order to minimize emissions; and that if emissions could not be reduced,

the plant should be moved farther away from the road and from residential neighborhoods.

In response, PJK submitted a letter from two scientists it had retained -- a toxicologist and a physicist specializing in exposure and risk assessment -- disagreeing with the industrial hygienist's conclusions. The scientists asserted that ambient air in and around the town of Acushnet met EPA air quality standards and that "site-related impacts" fell within limits set by DEP. The scientists concluded, based on "both the measured and the modeled impacts" of PJK's operations, that they did "not pose significant risks to the public health."

The board's industrial hygienist, in turn, responded with a letter stating that PJK's scientists had cited no data to substantiate their assertions about ambient air quality near the plant itself (as the nearest particulate matter monitoring station was twenty miles away) or about the plant's compliance with DEP limits. The industrial hygienist disclaimed any ability to opine on whether the plant posed "significant risks" to public health. He reiterated, however, that PJK was incorrect to assert that studies showed asphalt plant emissions "do not pose a health risk." His view was that there was a correlation between such emissions and health effects. Although "finding a true causal connection is scientifically challenging and requires carefully controlled study and statistical models

to prove," residents' reports of the nature and frequency of symptoms caused by PJK's plant emissions "must not be dismissed." He again recommended that, "[i]f odor complaints and symptoms cannot be mitigated, the . . . plant should be moved to a position further away from the road and adjacent neighborhood receptors."

     iv. Board's decision. In August 2022, the board reconvened to deliberate. One board member stated that he found the residents' testimony to be credible -- "people are not able to be in their backyards and enjoy life the way it's supposed to." He had read all of PJK's submissions, as well as those from the industrial hygienist, and "[n]owhere in this documentation [did he] find it refutes what's going on with the residents." He therefore moved to uphold the cease and desist order. The board's chair agreed, adding that he not only had read all of the information presented but also had gone by the area that morning and found the odor "pretty horrendous." The board then voted to uphold the order.[19]

     The board in its written decision found, as stated supra, that "the odor originating from [PJK's property] caused neighboring property owners to be prevented from enjoying the

---

     [19] The board's vote was two to zero. A third board member was present at the evidentiary hearing but was absent from the meeting at which the vote was taken.

outside of their properties because of the smell and burning of their eyes, nose and throat due to the odor and noxious air produced by the [asphalt] plant." The board concluded that the plant was a nuisance, and it ordered PJK to cease and desist from any operations that caused noxious odors and fumes to spread beyond the boundaries of PJK's property.

v. Analysis. We think it plain that the record contains substantial evidence supporting the board's conclusion that PJK's plant is a public nuisance. A public nuisance, as stated supra, includes "an unreasonable interference with a right common to the general public," which may in turn include "a significant interference with the public health." Sullivan, 448 Mass. at 34, quoting Restatement § 821B.

The board credited the residents' testimony that noxious odors from PJK's plant caused their eyes and noses to burn and their throats to become sore.[20] The residents testified that they experienced these odors several times a week and that their ability to use their properties and remain outside their homes was impaired. Several residents testified to the effects of odors emanating from trucks carrying hot asphalt out of the plant and onto public roads. Although only a limited number of

---

[20] The board's relatively brief written decision did not mention other symptoms testified to by some residents, or by the assistant health agent, such as nausea, dizziness, and headaches.

residents appeared at the hearing to testify, the board had documentary evidence of complaints from at least forty-one households, including households on all three sides of the plant where houses stood, permitting the board to conclude that the problem was widespread.

The complaints were not confined to conditions on residents' private properties but, as discussed supra, reported odors in neighborhoods, on public roads, and at businesses. In any event, the board could reasonably infer that, where many homes were affected, including homes up to a mile away from the plant, the odors did not stop at property lines but affected those on public roads as well.

The board was also entitled to view the evidence as showing a significant interference with the public health. It is not for us to disagree with the board and insist that burning eyes and noses and sore throats do not interfere with residents' health. Nor was the board required to accept PJK's assertion that "odors and fumes from asphalt production pose no health risk." The four reports PJK relied on for that assertion did not, individually or together, support any such broad conclusion. To be sure, the scientists retained by PJK asserted that the plant did "not pose significant risks to the public health." But the board could choose to credit its own industrial hygienist's view that the scientists' opinion was

unsupported by any data about air quality or emissions in the immediate vicinity of the plant, that the emissions could not be said to pose no health risk, that plant emissions generally were correlated with adverse health effects, and that the residents' symptoms "must not be dismissed."

The board could also properly reject PJK's claim that the persons complaining were "abnormally sensitive" to odors or "were suffering from physical or mental ailments not attributable to the odors." Strachan, 251 Mass. at 484. Although PJK cross-examined several of the residents who testified, PJK did not attempt to elicit any evidence about their sensitivities or the state of their health. PJK's argument in this regard was thus entirely unsupported. More generally, PJK's reliance on Strachan, where the court affirmed a finding that a particular oil refinery did not constitute a private nuisance, id. at 485-487, does not govern in this public nuisance case.

The board could find a public nuisance without finding that the whole town was affected or that the odors were present without letup twenty-four hours per day. The court held in Board of Health of Wareham, 329 Mass. at 175, that a board could enforce a cease and desist order under G. L. c. 111, § 143, against a processor whose fish-dehydration operations emitted foul odors that constituted a nuisance affecting "residents of

certain areas [of] the town of Wareham in the enjoyment and comfort of their homes" (emphasis added).  See Commonwealth v. Harris, 101 Mass. 29, 30 (1869) (loud disturbance in street constituted public nuisance even though not all those present were offended).  In the words of Restatement § 821B,

> "[i]t is not . . . necessary that the entire community be affected by a public nuisance, so long as the nuisance will interfere with those who come in contact with it in the exercise of a public right or it otherwise affects the interests of the community at large. . . .  In any case in which a private nuisance affects a large number of persons in their use and enjoyment of land it will normally be accompanied by some interference with the rights of the public as well.  Thus the spread of smoke, dust or fumes over a considerable area filled with private residences may interfere also with the use of the public streets or affect the health of so many persons as to involve the interests of the public at large."

Restatement § 821B comment g.[21]

That the plant is located in an area zoned for industrial use and was constructed in accordance with PJK's building permit does not immunize the plant from being found to create a public nuisance.  Although regulations promulgated by a board of health

---

[21] "A 'public right,' for purposes of a public nuisance, is more than an aggregate of private rights by a large number of injured people" but instead "is the right to a public good, such as an indivisible resource shared by the public at large, like air, water, or public rights-of-way."  58 Am. Jur. 2d Nuisances § 31 (2023).  "The test for interference with a right common to the general public, as an element of a public nuisance, is not the number of persons annoyed but the possibility of annoyance to the public by the invasion of its rights."  Id.  See, e.g., State v. Lead Indus. Ass'n, 951 A.2d 428, 448 (R.I. 2008), and cases cited.

"must not contravene the zoning laws, . . . the fact that a trade or employment is permitted under such laws does not mean that it need not also comply with valid orders and regulations of a board of health." Waltham v. Mignosa, 327 Mass. 250, 253 (1951) (Mignosa). The judge thus erred in relying on the proposition that a "plaintiff cannot restrain as a nuisance the doing in a reasonable and careful manner of the very act licensed." Czapski v. Sun Oil Co., 303 Mass. 186, 186 (1939). See Strachan, 251 Mass. at 487-488. Czapski and Strachan were private nuisance cases, brought by private plaintiffs; this is a public nuisance case, and thus Mignosa governs.[22] The board could find PJK's operations to constitute a public nuisance notwithstanding its compliance with zoning regulations.

Conclusion. In PJK's judicial review action, the judgment is reversed, and judgment shall enter affirming the decision of

---

[22] Moreover, it may be questioned whether PJK held a license to emit noxious odors from its plant. Among the express conditions on DEP's final air quality plan approval is that "should any nuisance condition(s), including . . . odor . . . occur as a result of the operation of the [f]acility, then the [p]ermittee shall immediately take appropriate steps including shutdown, if necessary, to abate said nuisance condition(s)." PJK thus makes no argument that the mere existence of the DEP plan approval preempts the board's authority vis-à-vis the plant. Further, the evidence before the board was that DEP had not inspected the plant since its relocation, and that PJK had not yet conducted compliance testing on the plant, because (according to PJK) the plant had not yet operated at a sufficiently high percentage of its rated capacity to make such testing acceptable to DEP.

the board.  In the board's enforcement action, the judgment of dismissal is vacated, and the case is remanded for such further enforcement proceedings as may prove to be necessary.

<u>So ordered</u>.